IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2020 SEP 24 A 8: 06

CLERK_____
SO. DIST. OF GA.

RANDY REESE, JESSICA REESE,    *
and LEONARD MARSHALL,          *
                               *
     Plaintiffs,               *
                               *
          v.                   *        CV 118-215
                               *
CSX TRANSPORTATION, INC.,      *
                               *
     Defendant.                *

---

**O R D E R**

---

Before the Court are several motions: (1) Defendant's motion for summary judgment (Doc. 43); (2) Plaintiffs' motion to exclude Mr. Thomas Robertson's supplemental expert reports (Doc. 54); (3) Plaintiffs' motion to exclude testimony of John Kerns, one of Defendant's Federal Rule of Civil Procedure 30(b)(6) witnesses (Doc. 56); (4) Defendant's motion to exclude expert testimony of Dr. Brian Wellington (Doc. 60); and (5) Plaintiffs' motion to strike conclusions of law contained in Defendant's statement of undisputed material facts and conclusions of law and Exhibit Eleven to Defendant's motion for summary judgment (Doc. 72). The Court addresses each motion herein.

## I. BACKGROUND[1]

Kudzu is as firmly rooted in Georgia horticultural lore as peanuts and peaches, but far more nefarious.

> Green, mindless, unkillable ghosts
> In Georgia, the legend says
> That you must close your windows
> At night to keep it out of the house
> The glass is tinged with green, even so . . . .

James Dickey, *Kudzu*, THE NEW YORKER, May 18, 1963, at 44.

### A. Plaintiffs' Property

Plaintiffs Jessica and Randy Reese owned real property in Martinez, Georgia, at 4078 Harden Court. (Def.'s Statement of Undisputed Material Facts ("SOUMF"), Doc. 44, ¶ 1 (undisputed)[2].) Plaintiff J. Reese purchased the home in 2006. (Id. (undisputed).) Plaintiff Marshall has owned the property located at 4080 Harden Court, Martinez, Georgia, since 2000. (Id. ¶ 2 (undisputed).)

### B. Defendant's Right-of-Way

Defendant operates several railroads, including one track that runs through Columbia County, Georgia. (Kerns 30(b)(6) Dep. Ex. 3, Doc. 57-3.) Defendant's right-of-way travels adjacent to Plaintiffs' property. (Def.'s SOUMF, ¶ 5 (undisputed).) The right-of-way extends sixty feet from the center of the track on

---

[1] The facts included in this section are general facts relevant to Defendant's motion for summary judgment and the case overall. The Court includes additional background information when necessary in each section addressing the respective motions.

[2] Where a fact is deemed "undisputed," the Court draws the absence of a dispute from Plaintiffs' response to Defendant's SOUMF, Doc. 70.)

either side.  (Pls.' Resp. to Def.'s SOUMF, Doc. 70, ¶ 5; Kerns 30(b)(6) Dep. Ex. 13, Doc. 57-13.)  An embankment slopes away from the railway.  (Robertson Decl., Doc. 48, ¶¶ 6, 9.)

At railroad milepost AK 470.54, a culvert[3] is planted beneath the railroad and embankment ("Culvert").  (Def.'s SOUMF, ¶ 6 (undisputed).)  The Culvert is twenty-two feet below the rail, extends ninety-six feet in length, and the Culvert's inlet is located near the back of Plaintiffs Jessica and Randy Reese's Property.  (Kerns Decl., Doc. 47, ¶¶ 6, 9.)  The Culvert's diameter measures forty-eight inches.  (Def.'s SOUMF, ¶ 6 (undisputed).)

## C. July 26, 2017 Rainfall

On July 26, 2017, rain fell in Columbia County at Defendant's right-of-way and Plaintiffs' property.  (Def.'s SOUMF, ¶ 12 (undisputed).)  The significance of the rain event, specifically, the rainfall total, however, is feverishly disputed.  (Id. ¶ 13 (undisputed).)  As discussed in greater detail below, the Parties contend the rainfall at the location at issue on July 26, 2017, totaled, from the Court's understanding, anywhere between 3.44[4] and 4.93 inches.  (Wellington Apr. 10, 2018 Technical Mem., Doc. 49-3, at 5; Robertson June 14, 2019 Engineering Report, Doc. 50-

---

[3] A culvert is a large pipe that directs the flow of water beneath the ground or a transportation system, such as a railroad or road.  (See Def.'s SOUMF, ¶¶ 7, 8.)

[4] On the lowest end, Dr. Wellington estimated the total rainfall to be 1.2 inches.  (Wellington May 16, 2019 Technical Mem., Doc. 49-2, at 5.)  Dr. Wellington acknowledges at this point that a mistake regarding dates generated the 1.2-inch calculation and he no longer relies on that figure.  See Section III(A)(5), infra.

1, at 8-9.)   The Parties also agree that of the total, a short duration of intense rainfall occurred, including at least one-hour of heavy rainfall.  (Wellington July 15, 2019 Technical Mem., Doc. 49-4, at 2; Robertson Aug. 14, 2019 Engineering Report, Doc. 50-2, at 5-6, 8.)   The Parties do not entirely agree on the one-hour period, but it indisputably falls sometime between 2:50 PM and 4:05 PM.  (Robertson Aug. 14, 2019 Engineering Report, at 5; Conway June 17, 2019 Meteorological Conditions Report, Doc. 45, at 28-30.)   The opinions of the relevant one-hour rainfall total range from 2.98 to 3.24 inches.   (Wellington July 15, 2019 Technical Mem., at 2; Robertson Aug. 14, 2019 Engineering Report, at 5.) The Parties further dispute the return frequency of a similar rain event, with recurrence rates ranging from thirty-one to five hundred years depending on metrics evaluated.   (Wellington July 15, 2019 Technical Mem., at 2; Robertson Nov. 13, 2019 Engineering Report, Doc. 50-3, at 7.)

## D. July 26, 2017 Flooding

The Reese family was in their home on July 26, 2017, when the rain began.  (R. Reese Aff., Doc. 67, ¶ 6.)   The water rapidly rose in the yard, moving the Reese's shop outside of their home off its foundation.  (Id. ¶¶ 6, 7.)   Shortly thereafter, water began to infiltrate the house.   (Id. ¶ 7.)   As the water level increased, the Reese house shifted off the foundation.  (Id. ¶¶ 9, 14.)  When the water receded sufficiently for the Reese Plaintiffs

4

to return to their home, they found standing water in the house as well as damage to their real and personal property. (Id. ¶ 12, 13, 14, 18.)

Albeit to a lesser degree, Plaintiff Marshall also experienced flooding. (Marshall Aff., Doc. 69, ¶ 8.) He too sustained damage to his real and personal property. (Id. ¶¶ 12, 13, 14.) The record contains no firm evidence of past flooding at Plaintiffs' property. (Def.'s SOUMF, ¶ 19.)

### E. Defendant's Culvert Inspections

According to Defendant, it inspects the track twice per week. (Kerns Decl., ¶ 12.) As part of the twice-per-week review, inspectors are to report any drainage issues. (Id.) Since 2017, Defendant inspected the Culvert annually, including an inspection on May 3, 2017. (Holzbach Decl., Doc. 46, ¶¶ 5, 6.) According to the bridge foreman responsible for examining the Culvert, at each inspection, he concluded kudzu in the proximity of the Culvert "posed no issue or concern with respect to the flow of water through the Culvert, and no maintenance was required." (Id.)

### F. The Kudzu

It is undisputed that kudzu is present at the entrance of the Culvert. (Def.'s SOUMF, ¶¶ 11, 18 (undisputed).) The Parties further agree that Plaintiffs never complained about the presence of kudzu on the Culvert prior to July 26, 2017. (Id. ¶ 19 (undisputed).) The agreement ends here. As noted, Defendant

asserts the kudzu poses no concern regarding water flow.  On the contrary, Plaintiffs contend vegetation and debris impeded the flow of water on July 26, 2017.   (Wellington Apr. 10, 2018 Technical Mem., at 13.)  Photographs taken immediately following the flood purportedly show vegetation and debris in the inlet of the Culvert and debris on the railroad embankment around and above the Culvert.  (Id. at 4; Def.'s Mot. for Summ. J. Ex. 2, Doc. 43-2, at 13-15.)  The Parties further dispute whether debris tangled in kudzu is capable of clearing absent physical removal.  (Kerns 30(b)(6) Dep., Doc. 57, at 88:25-89:4; R. Reese Dep., Doc. 51, at 80:16-21.)

## G. Expert Testimony

The expert testimony is discussed in greater detail below, but the Court notes the experts' respective positions.  The Parties offer competing expert testimony regarding the cause of Plaintiffs' flooding.   Both experts employed hydrology and hydraulic modeling to analyze the facts of this case.  The Parties' experts disagree regarding the amount of rainfall.

Plaintiffs retained Dr. Brian Wellington.  Based on the rainfall data used, the size of the Culvert, and other factors considered in his modeling, Dr. Wellington opines that the July 26, 2017 storm was not an unusual rain event for the area; the Culvert possessed the capacity to handle the July 26, 2017 rain event; and absent obstruction of the Culvert, the flooding

6

Plaintiffs experienced would not have occurred.  (Wellington Apr. 10, 2018 Technical Mem., at 13.)

Defendant's expert, Mr. Thomas Robertson, reached a different conclusion based upon his modeling.  Mr. Robertson determined that when evaluating the rainfall during the essential one-hour window, the rain event was highly unusual for the area.  Further, Mr. Robertson opines that even if the Culvert was completely clear and fully operational, the significance of the rainfall would have caused the flooding.  (Robertson Nov. 13, 2019 Engineering Report, at 6-7.)

Having set out the overall facts relevant to this action, the Court turns to the pending motions.

## II. DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT, BRIAN WELLINGTON, PH. D., PE

The Court first addresses Defendant's motion to exclude the testimony of Plaintiffs' expert, Dr. Brian Wellington.  (Def.'s Mot. to Exclude Wellington Test., Doc. 60.)

### A. Daubert Standard

Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), govern the admissibility of expert testimony.  Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

7

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"As the Supreme Court recognized in <u>Daubert</u> . . . , Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1340 (11th Cir. 2003). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. <u>Quiet Tech. DC-8</u>, 326 F.3d at 1340. Specifically, the court must consider whether:

(1) The expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

8

Id. at 1340-41 (quoting Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir., 1998)).

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. Trilink Saw Chain, LLC v. Blount, Inc. 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008). "A witness's qualifications must correspond to the subject matter of his proffered testimony." Anderson v. Columbia Cnty., No. CV 112-031, 2014 WL 8103792, at *7 (S.D. Ga. Mar. 31, 2014) (citing Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999)).

Second, the testifying expert's opinions must be reliable. In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. Courts should consider four factors when applicable, whether the theory or technique: (1) can be tested, (2) has been subject to peer review, (3) has a known or potential rate of error, and (4) has attained general acceptance in the relevant community. Id. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United

States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004).   For

example, experience-based experts need not satisfy the factors set

forth in Daubert.   See United States v. Valdes, 681 F. App'x 874,

881 (11th Cir. 2017) (affirming admission of testimony from expert

identifying firearms based upon his years of experience working

with firearms).   But, "[t]he inquiry is no less exacting where the

expert 'witness is relying solely on experience' rather than

scientific methodology."   Summit at Paces, LLC v. RBC Bank, No.

1:09-cv-03504-SCJ, 2012 WL 13076793, at *2 (N.D. Ga. May 22, 2012)

(quoting FED. R. EVID. 702, advisory committee's notes to 2000

amendment).   Bearing in mind the diversity of expert testimony,

"the trial judge must have considerable leeway in deciding in a

particular case how to go about determining whether particular

expert testimony is reliable."   Kuhmo Tire Co. v. Carmichael, 526

U.S. 137, 152 (1999).

Regardless of the specific factors considered, "[p]roposed

testimony must be supported by appropriate validation – i.e., 'good

grounds,' based on what is known."   Daubert, 509 U.S. at 590.   In

most cases, "[t]he expert's testimony must be grounded in an

accepted body of learning or experience in the expert's field, and

the expert must explain how the conclusion is so grounded."   FED.

R. EVID. 702, advisory committee's notes to 2000 amendment.

"Presenting a summary of a proffered expert's testimony in the

form of conclusory statements devoid of factual or analytical

support is simply not enough" to carry the proponent's burden. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (emphasis and citation omitted).

Third, expert testimony must assist the trier of fact to decide a fact at issue. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Id. at 591; Frazier, 387 F.3d at 1262. Yet, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63.

**B. Discussion**

To begin, Defendant recognizes that Dr. Wellington's credentials render him qualified to testify as an expert.[5] (Def.'s Mot. to Exclude Wellington Test., at 2.) Instead, Defendant takes

---

[5] Dr. Wellington's expertise involves conducting hydrological studies, hydrological designs, and storm water investigations involving modeling and remediation plans. (Wellington Aff., Doc. 63, ¶ 2.)

11

issue with two of the conclusions Dr. Wellington reached in his reports: (1) The July 26, 2017 storm was not an unusual event for the area, and (2) Kudzu and debris interfered with the usual flow of water through the Culvert causing the flooding.   (Id. at 17-25.)

### 1. Likelihood of the July 26, 2017 Storm

Defendant uses disagreement regarding rain amounts to support its argument that Daubert requires exclusion of Dr. Wellington's opinion regarding the frequency of storms similar to the one experienced on July 26, 2017.  According to Defendant, the rainfall data Dr. Wellington employed in his modeling inaccurately reflects the amount of precipitation, thereby rendering his conclusion unreliable.   No reason presented justifies excluding Dr. Wellington's opinion on this issue.

Beginning with the direct point of contention — the amount of rainfall occurring at or near the Culvert on July 26, 2017 — the Parties agree there was no rain gauge in the immediate vicinity of the Culvert at the time of the storm.   Without direct data regarding the amount of rain at or directly near the Culvert, the Parties, and their experts, were forced to attempt to determine the amount of rain that fell using rain gauges in the surrounding areas and meteorological data.  As Mr. Robertson surmised, "[T]he best thing that could have happened is if you had a rain gauge right there, but we don't have a rain gauge right there, so one

has to make the best judgment one can about what rainfall is more likely to have occurred there." (Robertson Dep., Doc. 50, at 40:21-25.) This basic fact addresses the disagreement.

Absent data from the actual incident site, the Parties' submissions reveal determining the rainfall amount on July 26, 2017, has been, frankly, a moving target. (See Section III(A), infra.) Difficulty obtaining an exact amount of rainfall without an on-premise rain gauge is to be expected as, to the Court's knowledge, the science community has not yet developed a procedure for directly replicating a specific weather event at a particular location.

Therefore, the experts confronted the challenge of determining the amount of rain that fell to the best of their abilities. Dr. Wellington initially elected to use data from National Oceanic and Atmospheric Administration ("NOAA") rain gauges in Martinez and Evans, Georgia. (Wellington Dep., Doc. 49, at 82:8-83:4.) Of the two, Dr. Wellington chose the reading exhibiting the greatest rain fall, the Martinez rain gauge, in his initial report. (Id. at 84:4-21.) Defendant's issues with the NOAA rain gauges involve their respective distances from Plaintiffs' property.[6] (Def.'s Mot. to Exclude Wellington Test., at 17-18.) Eventually, however, Dr. Wellington acknowledged that

---

[6] Defendant offers no authority from other courts resolving cases asserting claims resulting from flood damage demanding that an expert use rain measurements from the closest possible rain gauge.

one of Defendant's experts, Bill Conway, provided a more accurate estimate of the rainfall that the July 26, 2017 storm produced. (Wellington July 15, 2019 Technical Mem., at 2.)  Therefore, at this point, it does not appear Dr. Wellington exclusively relies on his initial readings from the Evans and Martinez NOAA rain gauges, if he relies on them at all.  Dr. Wellington expressly stated in one of his reports, "Mr. Conway is correct that based on his analysis during the time period 1:55 PM EDT and 4:20 PM EDT approximately 3.62 inches of rainfall occurred." (Id. at 2.)  For this reason, the Court sees no justification to exclude Dr. Wellington's opinions based upon his failure to utilize rainfall figures from rain gauges closer to Plaintiffs' property.  See Coward v. Forester Realty, Inc., No. 4:15-CV-0245-HLM, 2018 WL 1980368, at *19 (N.D. Ga. Feb. 20, 2018) (citing Manpower, Inc. v. Ins. Co. of Pa., 732 F.3d 796, 809 (7th Cir. 2013)) (finding disputes regarding proper use of rain gauge data are for the jury, not the judge).

Next, Defendant argues that Dr. Wellington improperly extrapolated the rainfall data over a twenty-four-hour period — rather than accounting for a shorter duration of more intense rainfall — to determine the probability of a similar weather event. (Def.'s Mot. to Exclude Wellington Test., at 18.)  In response, Plaintiffs assert that Dr. Wellington relied upon the Soil Conservation Service ("SCS") method set forth in the Georgia

Stormwater Management Manual ("GSMM"), which is better suited to analyze rainfall in twenty-four-hour increments. (Pls.' Resp. to Def.'s Mot. to Exclude Wellington Test., Doc. 64, at 16-17.)

Evaluating the reliability of Dr. Wellington's use of the methodology contained in the GSMM, the Court finds no significant issues. First, Plaintiffs' SCS modeling is capable of being tested. Second, although the Parties omit references to specific examples of peer review, the manual explains that several persons review the GSMM during its production and provide commentary. Georgia Stormwater Management Manual (2016 ed.), at Foreword (continued). Finally, the GSMM appears to have gained general acceptance in Georgia and local communities as providing, at a minimum, recognized practices for designing stormwater management structures. (See Def.'s Mot. to Exclude Wellington Test., at 18.) Accordingly, analyzing the relevant factors, the Court finds Dr. Wellington's methodology passes Daubert scrutiny.

Although not expressly mentioned, Defendant appears to argue that Dr. Wellington's methodology is not relevant, and therefore, is unable to assist the trier of fact. According to Defendant, the recurrence interval is properly determined based upon one hour of rainfall.

Initially, the Court notes that Defendant omits any direct reference to this issue in its reply brief. (See Def.'s Reply Supp. Mot. to Exclude Wellington Test., Doc. 78.) Therefore, it

15

is unclear if Defendant abandons its relevance argument. Nevertheless, Dr. Wellington's opinion is sufficiently relevant. As Dr. Wellington explains, the software employed to perform the hydrology analysis and hydraulic design defines total rainfall in terms of a twenty-four-hour period. (Wellington July 15, 2019 Technical Mem., at 2.) Pursuant to Dr. Wellington, maximum discharge capacity is generally measured in terms of rain accumulation over a twenty-four-hour period considering the culvert's size and slope. (Id.; Wellington Aff., ¶ 7.) The modeling Dr. Wellington utilized allows an input for different rain events, and Dr. Wellington entered a "Type-II" storm, typical for Georgia, which is considered a weather event with the shortest duration, most intense rainfall. (Wellington Dep., at 91:2-4.). Dr. Wellington noted in his deposition that although the total accumulation is distributed over a twenty-four-hour period, the Type-II modeling focuses the majority of the rainfall over a two-hour period. (Wellington Dep., at 90:4-8.)

Defendant claims that Dr. Wellington's modeling is irrelevant because he employs a mechanism used in designing a culvert for a specific area but inappropriate for determining whether the Culvert should handle the capacity in the circumstances presented, one-hour of intense rain. Ultimately, this is a case regarding the Culvert's ability to accommodate the storm in question if properly maintained. The Court is not tasked with determining

16

whether one party's modeling or methodology is more relevant or more likely to assist the jury. See Coward, 2018 WL 1980368, at *19. Instead, the Court considers whether the methodology is reliable and the information will assist the trier of fact. The jury may decide to reject Dr. Wellington's modeling in favor of Defendant's, or vice versa. That, however, does not render Dr. Wellington's opinion irrelevant. The Court sees no reason why standard calculations applied in designing a culvert to match the desired capacity is unhelpful to the jury, and Defendant offers no authority establishing Dr. Wellington's modeling is irrelevant in flood cases.[7] Accordingly, Dr. Wellington's opinions regarding the storm-in-question's recurrence interval are allowed, and presentation of competing evidence on the issue is proper for the jury.

Finally, Defendant complains that Dr. Wellington's downward departure from Mr. Conway's one-hour calculation is incorrect and a manipulation of Mr. Conway's data. (Def.'s Mot. to Exclude Wellington Test., at 19.) According to Mr. Conway, between 1:55 PM and 4:20 PM on July 26, 2017, approximately 3.62 inches of rain fell at Plaintiffs' addresses after factoring a bias correction. (Conway June 17, 2019 Meteorological Conditions Report, at 28-30.) Mr. Conway's approximation ultimately concluded that 3.21 inches

---

[7] The above is especially true considering whether Defendant exercised its duty of care in light of a foreseeable rain event is directly relevant to Plaintiffs' negligence claim. See Section VI(B)(2), *infra*.

of rain fell between 3:00 PM and 4:00 PM.[8] Dr. Wellington's opinion is that Mr. Conway erroneously calculated the one-hour rainfall total. (Wellington July 15, 2019 Technical Mem., at 2.)

Although Mr. Conway and Dr. Wellington disagree on the appropriate quantity of rain over the one-hour period, the Parties, overall, seemingly agree that accounting for radar bias is appropriate when utilizing radar data to best estimate rainfall. (Id.; Conway June 17, 2019 Meteorological Conditions Report, at 26-27, 34.) Dr. Wellington and Mr. Conway simply differ on the proper amount to deduct for rain falling before 3:00 PM. According to Dr. Wellington, based upon Mr. Conway's data, 2.98 inches of rain fell between 3:00 PM and 4:00 PM. From what the Court discerns, Dr. Wellington interprets Mr. Conway's data to assume rain accumulations at 2:55 PM of 0.35 inches, at 3:00 PM of 0.58 inches, at 4:00 PM of 3.56 inches, and at 4:20 PM of 3.62 inches. Subtracting the rain accumulation at 3:00 PM (0.58 inches) from 3.5 inches (Mr. Conway's estimation of the rainfall between 3:00 PM and 4:00 PM) results in the 2.92-inch figure in Dr. Wellington's July 15, 2019 Report. Mr. Conway's 3.21-inch figure is reached by

---

[8] Mr. Conway initially concluded that 3.5 inches of rain fell between 3:00 PM and 4:00 PM. (Conway June 17, 2019 Meteorological Conditions Report, at 34.) Dr. Wellington pointed out that Mr. Conway failed to account for rain falling prior to 3:00 PM in his reduction. (Wellington July 15, 2019 Technical Mem., at 2.) In his rebuttal report, Mr. Conway acknowledged the error and reduced his estimation for the rainfall between 3:00 PM and 4:00 PM to 3.21 inches. (Conway Aug. 12, 2019 Meteorological Conditions Report, Doc. 45, at 60.)

subtracting the cumulative amount at 2:55 PM (0.35 inches) from the cumulative amount at 4:00 PM (3.56 inches).

Admittedly, the disagreement between Dr. Wellington and Mr. Conway may be as simple as differing ways to interpret Mr. Conway's data. Again, it is not the Court's responsibility to decide different interpretations of data, and Defendant points to no justification under Daubert to exclude Dr. Wellington's opinion regarding the accumulation between 3:00 PM and 4:00 PM. The method used to calculate the underlying data is Mr. Conway's work, not Dr. Wellington's. Additionally, considering the contention boils down to a disagreement regarding the correct amount of deduction from the total rainfall, the Court cannot say that either opinion is irrelevant.

Therefore, Dr. Wellington's opinion regarding the appropriate frequency interval for the July 26, 2017 storm is admitted; and any disputes regarding his opinion may be explored through cross-examination, competing evidence, and argument.

2. Kudzu Caused Flooding

Secondly, Defendant seeks to exclude Dr. Wellington's opinion that kudzu blocked the Culvert causing the flooding. (Def.'s Mot. to Exclude Wellington Test., at 20-25.) Defendant proclaims that Dr. Wellington's analysis works backwards, finding that if the property flooded, Culvert blockage must have been the cause. (Id. at 22.) Although Dr. Wellington's conclusion depends on the amount

of rainfall, the issue discussed in Section II(B)(1), *supra*, the kudzu opinion requires some additional nuanced examination.

Initially, it is important to focus on Dr. Wellington's opinion: "Flooding and the resulting flood related damages on the Reese and Marshall properties was a result of vegetation and debris buildup at the inlet of the [forty-eight[-]inch] [C]ulvert pipe below the CSX Railway Track. This resulted in a reduction in flow capacity of the [C]ulvert that resulted in flooding." (Wellington Apr. 10, 2018 Technical Mem., at 13.) Therefore, Dr. Wellington does not purport that the kudzu alone caused the flooding but that the buildup of vegetation resulted in a collection of debris blocking flow through the Culvert.

Defendant's position is that Dr. Wellington's opinion is *ipse dixit* because his conclusions remain the same despite changing underlying data:

> Perhaps more troubling than Wellington's determination to cling to a lower rainfall total is his willingness to opine that kudzu *must* have trapped debris in the [C]ulvert and clogged it **no matter how much rain actually fell** and **no matter the physical evidence**. In essence, Wellington claims heavy debris was trapped at the [C]ulvert, and that this must have been the cause of the flood, **no matter how much rain actually fell**, and without an unusual storm event.

(Def.'s Reply Supp. Mot. to Exclude Wellington Test., at 10 (emphasis in original).) It is true that Dr. Wellington reaches the same conclusions in each report. (See Wellington Apr. 10, 2018 Technical Mem., at 13; Wellington May 16, 2019 Technical Mem.,

Doc. 49-2, at 13; Wellington July 15, 2019 Technical Mem., at 7-8.)   As previously discussed, Dr. Wellington's modeling survives Daubert analysis.   Additionally, Dr. Wellington's conclusion that absent some obstruction of the Culvert, the Culvert had the capacity to prevent flooding, is not necessarily *ipse dixit*.   Dr. Wellington acknowledged that hydrology methodology varies, and Dr. Wellington and Mr. Robertson both used different models to analyze the impact of the rainfall.   (Wellington Dep., at 105:7-107:3.) The Parties' experts believe their counterparts employ a less proper modeling procedure, a belief that is natural in cases involving competing expert testimony.   Going the other way, Dr. Wellington disputes Mr. Robertson's conclusions on his assumptions, data, and modeling type and not on the grounds that Mr. Robertson's calculations are erroneous.   (Id. at 106:8-18; Wellington July 15, 2019 Technical Mem., at 7.)   Defendant even acknowledges that Dr. Wellington offers no rebuttal to Mr. Robertson's conclusion that 4.75 inches of rain in one hour would cause flooding even assuming an unobstructed Culvert.   (Def.'s Mot. to Exclude Wellington Test., at 22-23.)

Therefore, Defendant's contention that Dr. Wellington automatically reaches the same conclusion oversimplifies Dr. Wellington's position.   Yes, in the data and modeling that Dr. Wellington employed, he reached the conclusion that flooding would not have occurred without obstruction to the Culvert.   Dr.

Wellington, however, seemingly concedes that Mr. Robertson's data and modeling reveal flooding even without obstruction. More tellingly, Defendant's summary inaccurately reflects Dr. Wellington's deposition testimony:

> Q: Do you know of anything else beyond the kudzu and these brownish roots? Do you know what else is in there?
>
> A: Well, I think the kudzu, brownish roots, and, you know, the wheelbarrow that I see over there. The pallet over there, that concrete pedestal at the top of the embankment, the pieces of wood.
>
> Q: So are you relying on anything to support your opinions about the kudzu or other vegetation and debris other than your intuition?
>
> A: Not intuition, it's more experience.
>
> Q: With these other cases?
>
> A: Yes.
>
> Q: And with these other cases, the culvert was blocked?
>
> A: Sometimes the culvert was complete [sic] blocked, sometimes partially blocked.
>
> Q: And what happened as a result of either the complete or partial blockage?
>
> A: Sometimes you have flooding.
>
> Q: Did sometimes you not have flooding?
>
> A: Yeah — well, depends on how much rain occurred.
>
>      . . .
>
> Q: And when you were saying about — talking about these other cases and sometimes it was completely blocked or sometimes partially blocked and sometimes there was flooding and you said it would depend on rain. Would

that depend on both the amount and the intensity of the
storm?

A: Yes.

Q: You mean the time period that the rain came down?

A: Yeah.

(Wellington Dep., at 129:6–130:3, 130:18–131:2.)   Dr. Wellington
expressly acknowledges that rain amount is an important
consideration.   From the information before the Court, Dr.
Wellington is not opining that no amount of rain could cause the
flood absent an obstructed Culvert.   Instead, he relies on his
modeling and experience in past cases involving flooding
correlating with vegetation and debris obstructing the Culvert.

To the extent Defendant questions Dr. Wellington's experience
leads him to the conclusion that vegetation overgrowth traps debris
and clogs a culvert, Dr. Wellington is qualified to testify to
that opinion, and the information will assist the trier of fact
because most persons are likely unfamiliar with the operations of
culverts and the impact of vegetation and debris on their function.
Defendant's challenge of Dr. Wellington's experiential conclusion
is primarily one of methodology.   "The Eleventh Circuit has
recognized the existence of experience-based methodology."
Evanston Ins. Co. v. Xytex Tissue Servs., LLC, 378 F. Supp. 3d
1267, 1282 (S.D. Ga. 2019) (citing Frazier, 387 F.3d at 1262).
"To be sure, there are instances in which a district court may

determine the reliability prong under <u>Daubert</u> based primarily upon an expert's experience and general knowledge in the field . . . ." <u>Kilpatrick v. Breg, Inc.</u>, 613 F.3d 1329, 1336 (11th Cir. 2010).

Although Dr. Wellington admits he is yet to perform testing regarding water flow through kudzu, at no point does Defendant argue Dr. Wellington lacks experience investigating culverts and flooding. (<u>See</u> Wellington Dep., at 7-11.) In his deposition, Dr. Wellington referred to a similar experience involving a debris-obstructed culvert. (<u>Id.</u> at 130:2-131:6.) As the Eleventh Circuit found in <u>Valdes</u>, "identification and comparison" is not an insufficient methodology to render expert testimony inadmissible when the expert is otherwise qualified. 681 F. App'x 874 at 881.

Here, Dr. Wellington ran the modeling suggesting the flood would not have occurred absent an obstructed Culvert, examined the Culvert and found the entrance obstructed by kudzu, and compared the case to others in which vegetation and debris inhibited proper current through a culvert. Furthermore, Dr. Wellington testifies that other hydrology experts would agree that vegetation may capture debris and barricade a culvert. (Wellington Dep., at 124:7-125:2.) As this Court recently found in <u>Evanston Ins.</u>, when an expert is relying on "common knowledge" in the relevant scientific community, experience in that industry is likely sufficient to render the expert's opinion admissible. 378 F. Supp. 3d at 1282-83.

Finally, the Court agrees with Defendant on one issue regarding Dr. Wellington's testimony.   The record contains evidence of debris on Plaintiffs' property; in the area surrounding the Culvert, such as on the railroad embankment; and strained by a fence near the Culvert.   (Wellington Dep., at 129:7-12.)   The Court precludes Dr. Wellington from asserting, as part of his conclusion that vegetation and debris inhibited the Culvert, that the specific items photographed around the Culvert and on Plaintiffs' property after the storm were, in fact, the debris that clogged the Culvert.   As noted, the Court is comfortable that Dr. Wellington's testimony is sufficiently reliable to the extent that based on his data, modeling, and experience, he concludes the obstructed Culvert caused the flooding.   Plaintiffs, however, do not show that Dr. Wellington satisfies the methodology prong of Daubert to admit a conclusion that specific debris found in proximity to, but not directly in, the Culvert actually tangled in the vegetation.   Plaintiffs offer no testing to this fact, and the Court is unaware of evidence establishing that Dr. Wellington possesses sufficient experience to examine a culvert and determine which items of debris caused the culvert to fail other than those located inside or in the mouth of the culvert in question.   Jones v. Otis Elevator Co., 861 F.2d 655, 662 (11th Cir. 1988) ("[R]elevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a

reasonably accurate conclusion as opposed to conjecture or speculation."); cf. McClain v. Metabolife, 401 F.3d 1233, 1245 (11th Cir. 2005) (finding expert only able to reach conclusion by leap of faith).

Based on the foregoing, the Court concludes that as to Dr. Wellington's conclusion that a mixture of vegetation of debris caused the flooding (1) Dr. Wellington is qualified to testify; (2) Dr. Wellington's methodology for his opinion that vegetation and debris caused the flooding is sufficiently reliable based upon his modeling and experience; and (3) Dr. Wellington's testimony on this issue will assist the trier of fact.  Except as otherwise limited herein, Dr. Wellington's testimony is admissible as expert testimony.

### III. PLAINTIFFS' MOTION TO EXCLUDE THOMAS ROBERTSON'S SUPPLEMENTAL EXPERT REPORTS

Plaintiffs move to exclude Thomas Robertson's, engineering and hydrology expert for Defendant, supplemental reports.  (Pls.' Mot. to Exclude Robertson Suppl. Reports, Doc. 54.)  Plaintiffs appear to argue that the supplemental reports are properly excluded for two reasons: (1) Mr. Robertson impermissibly supplemented his initial report, and (2) Defendant failed to timely provide the supplemental reports to Plaintiffs pursuant to Federal Rule of Civil Procedure 26, and therefore, Federal Rule of Civil Procedure

37(c)(1) directs the Court to exclude them. (Id. at 2-4.) Under either theory, Plaintiffs' motion fails.

## A. Background

Before proceeding to the issue of whether Mr. Robertson's second and third reports are timely, it is necessary to set forth the relevant timeline of expert discovery involving Dr. Wellington and Mr. Robertson.

### 1. Dr. Wellington's April 10, 2018 Technical Memorandum

On April 10, 2018, Dr. Wellington provided his first technical memorandum. (Wellington Apr. 10, 2018 Technical Mem.) In forming his initial report, Dr. Wellington understood the events in question occurred on July 27, 2017. (Wellington Dep., at 165:3-8.) Because of his belief, he used NOAA rain gauge data to determine that 3.44 inches fell on the date in question. (Wellington Apr. 10, 2018 Technical Mem., at 5.) Accordingly, Dr. Wellington based his initial conclusions on a rainfall of 3.44 inches.

### 2. Dr. Wellington's May 16, 2019 Technical Memorandum

Upon discovering the relevant events occurred on July 26, 2017, and believing that he incorrectly captured rainfall for July 27, 2017, in his April 10, 2018 report; Dr. Wellington obtained rainfall totals from one day earlier to include in his May 16, 2019 Technical Memorandum. (Wellington Dep., at 164:21-165:11.) Therefore, the May 16, 2019 report reached its conclusions

27

utilizing rainfall data of 1.2 inches. (Wellington May 16, 2019 Technical Mem., at 5.) Although Dr. Wellington's first and second reports ultimately reached the same conclusions, the underlying data contributing to those conclusions changed dramatically.

### 3. Mr. Robertson's June 14, 2019 Engineering Report

Mr. Robertson submitted his first expert report dated June 14, 2019. (Robertson June 14, 2019 Engineering Report.) Mr. Robertson's hydrologic and hydraulic analysis studied two separate rain amounts: (1) Bill Conway's 3.62 inches and (2) 4.93 inches from private rain gauges located in the West Lynne Subdivision. (Id. at 8-9.) In reaching his conclusions, Mr. Robertson also reviewed and responded to Dr. Wellington's most recent report at the time, the May 16, 2019 Technical Memorandum. (Id. at 6, 10-11.)

### 4. First Revised Scheduling Order Extending Discovery

Pursuant to the original Scheduling Order, the Plaintiffs' deadline to furnish an expert report was May 16, 2019. (Scheduling Order, Doc. 11.) The Scheduling Order established June 17, 2019, as Defendant's deadline.[9] (Id.) On June 21, 2019, the Parties jointly moved for an extension of the discovery deadline, which

---

[9] Although not disclosed in the Parties' Rule 26(f) Report (Doc. 10) and, therefore, not included in the Scheduling Orders, the Parties apparently agreed to allow Dr. Wellington to submit a rebuttal report. (Pls.' Mot. to Exclude Robertson Suppl. Reports Ex. A, Doc. 54, at 7.)

the Court granted.[10]  (Joint Mot. for Extension of Disc., Doc. 30;
Revised Scheduling Order, Doc. 31.)  The Revised Scheduling Order
established September 19, 2019, as the close of discovery.
(Revised Scheduling Order.)

### 5. Dr. Wellington's July 15, 2019 Technical Memorandum

Dr. Wellington then composed his rebuttal report dated July
15, 2019. (Wellington July 15, 2019 Technical Mem.)  Again, Dr.
Wellington amended the data underlying his conclusions.  Following
Mr. Conway's report, Dr. Wellington recognized that the rainfall
data he used in the May 16, 2019 report primarily included rainfall
from July 25, 2017, the day prior to the flood.  (Wellington Dep.,
at 165:10-18.)  So, when Dr. Wellington thought he mistakenly used
the wrong day's rainfall data in his first report, he actually
primarily picked up rainfall totals from July 26, 2017, the day at
issue in this case.  (Id.)

Recognizing his confusion, Dr. Wellington acknowledged Mr.
Conway's rainfall totals likely constituted the most accurate
data. (Wellington July 15, 2019 Technical Mem., at 2; Wellington
Dep., at 165:15-18.)  Using 3.62 as the total rainfall from 1:55
PM until 4:20 PM, Dr. Wellington concluded 2.98 inches of rain
fell between 3:00 PM and 4:00 PM.  (Wellington July 15, 2019

---

[10] Because the deadlines to furnish expert reports expired prior to Plaintiffs'
motion for an extension of the discovery deadlines, the Revised Scheduling Order
did not extend the deadline to furnish expert reports.  (See Revised Scheduling
Order, Doc. 31 ("All provisions of the prior Scheduling Order, (doc. no. 11),
not revised herein shall remain in full force and effect).)

Technical Mem., at 2.)   Additionally, Dr. Wellington's July 15, 2019 Technical Memorandum is the first time Dr. Wellington acknowledged one hour of intense rainfall.   (See generally Wellington Apr. 10, 2018 Technical Mem.; Wellington May 16, 2019 Technical Mem.)   Previously, Dr. Wellington operated under the theory that the total rainfall for the day is properly analyzed as a twenty-four-hour event.   (Wellington Dep., at 190:18-22; see Wellington Apr. 10, 2018 Technical Mem., at 5; Wellington May 16, 2019 Technical Mem., at 5.)   Therefore, although Dr. Wellington ultimately reached the same conclusions in his July 15, 2019 report as the previous two reports, the underlying data again underwent substantial amendment.

### 6. Mr. Robertson's August 14, 2019 Engineering Report

Mr. Robertson's August 14, 2019 Engineering Report responded specifically to Dr. Wellington's July 15, 2019 Technical Memorandum on at least two significant fronts.[11]   For the first time, Mr. Robertson confronted Dr. Wellington's revised data understanding the total short duration rainfall to be 3.62 inches and the one-hour total to be 2.98 inches.   Dr. Wellington's amendment to his rainfall totals and duration necessitated Mr. Robertson's response because, according to Mr. Robertson, the Rational Method model he employed is better suited to analyze short

---

[11] Mr. Robertson noted that his August 14, 2019 report considered Dr. Wellington's July 15, 2019 Technical Memorandum.   (Robertson Aug. 14, 2019 Engineering Report, at 4.)

duration storms whereas Dr. Wellington's SCS Method model is designed to analyze rainfall over a twenty-four-hour period. (Robertson Aug. 14, 2019 Engineering Report, at 4-5, 7.)

Finally, Mr. Robertson's August 14, 2019 Engineering Report also needed amendment to correct inaccurate information.   Mr. Robertson corrected prior incorrect data concerning the time of the rain and slightly disputed the time of the heaviest rain in Dr. Wellington's July 15, 2019 Technical Memorandum.   (Robertson Dep., at 58:10-59:8; compare Robertson Aug. 14, 2019 Engineering Report, at 5, with Wellington July 15, 2019 Technical Mem., at 2.) The confusion arose because Weather Underground displayed its rainfall data under a different time zone, and Mr. Robertson received corrupted time zone conversion data.   (Robertson Aug. 14, 2019 Engineering Report, at 5.)

7. Dr. Wellington's August 16, 2019 Deposition and Watershed Model Schematic

Shortly thereafter, Defendant conducted its deposition of Dr. Wellington.   (Wellington Dep., at 1.)   At his deposition, Plaintiffs produced Dr. Wellington's Watershed Model Schematic (Wellington Watershed Model Schematic, Doc. 49-5) and provided the reasoning for the additional modeling.   At the outset, Dr. Wellington explained that, for the first time, he plugged the short duration rainfall data into his SCS Method model.[12]   (Wellington

---

[12] As discussed, Dr. Wellington employed the SCS Method model and Mr. Robertson employed a Rational Method model.   (See Robertson Dep., at 33:3-11.)   The

Dep., at 216:21-217:9.)   Dr. Wellington's input included a curve number ("CN") of seventy-five.[13]   (Id. at 219:18-220:19.)   Dr. Wellington located the CN number by determining the soil type and utilizing the corresponding CN number directed in the GSMM after finding that Plaintiffs' property has a B soil type and the surrounding areas have A, B, C, and D types.   (Id. at 219:18-220:19.)   Dr. Wellington noted that seventy-five departed from the CN of eighty-seven employed in previous modeling.   (Id. at 230:6-8.)   The foregoing demonstrates that Dr. Wellington, again, performed new modeling, with new assumptions, not previously discussed.

### 8. Second Revised Scheduling Order Extending Discovery

On August 21, 2019, Plaintiffs filed an unopposed motion to further extend discovery.   (Pls.' Mot. for Extension of Disc., Doc. 34.)   The Court again granted an extension of the discovery deadlines.   (Second Revised Scheduling Order, Doc. 35.)   The Second Revised Scheduling Order set November 5, 2019, as the discovery deadline.   (Id.)

### 9. Mr. Robertson's November 13, 2019 Engineering Report

Before Mr. Robertson's deposition, he supplied Plaintiffs with another report.   (Robertson Nov. 13, 2019 Engineering Report.)

---

discrepancy in modeling results in the two experts analyzing similar rain data while reaching different conclusions.

[13] Within the modeling software, the curve number or CN is a coefficient representing the anticipated runoff based upon soil type in the area. (Wellington Dep., at 100:17-101:1.)

Mr. Robertson's November 13, 2019 Engineering Report primarily responded to data first raised in Dr. Wellington's August 16, 2019 Deposition and Watershed Model Schematic.   As examples, Mr. Robertson recognized that Dr. Wellington, for the first time, applied short duration rainfall measurements to his SCS Method model; disputed Dr. Wellington's findings related to soil types and the corresponding CN value; and disagreed with Dr. Wellington's revised rainfall total.   (Robertson Nov. 13, 2019 Engineering Report, at 4-6.)   Although Mr. Robertson reached the same conclusions as his previous reports, the November 13, 2019 Engineering Report incorporated rebuttals not previously enumerated.

## B. Rule 26

As the Parties are aware, Rule 37(c) triggers upon a violation of Rule 26(a) or (e).   FED. R. CIV. P. 37(c)(1).   The Court, therefore, begins with determining whether a violation of Rule 26(a) or (e) occurred.   Two sections of Rule 26 pertain to the Court's analysis.   Pursuant to Rule 26(a)(2)(D), a party must disclose its expert report:

> Absent a stipulation or a court order, . . . (i) at least [ninety] days before the date set for trial or for the case to be ready for trial; or (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under [expert disclosure rules], within [thirty] days after the party's disclosure.

Rule 26(a)(2)(E) requires parties to supplement disclosures in accordance with Rule 26(e). Rule 26(e) imposes a requirement on litigants to supplement or correct expert disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." "The disclosure requirements aim to provide parties with a reasonable opportunity to prepare effective cross examination and arrange for rebuttal testimony from other experts if needed." Long v. East Coast Waffles, Inc., 762 F. App'x 869, 870 (11th Cir. 2019).

## C. Rebuttal Report Standard

United States Magistrate Judge George R. Smith highlighted the rule in the Southern District of Georgia used to determine whether expert opinion qualifies as rebuttal:

> Rebuttal expert reports necessitate a showing of facts
> supporting the opposite conclusion of those at which the
> opposing party's expert arrived in their responsive
> reports. Rebuttal expert reports are proper if they
> contradict or rebut the subject matter of the
> affirmative expert report. They are not, however, the
> proper place for presenting new arguments. If the
> purpose of expert testimony is to contradict an expected
> and anticipated portion of the other party's case-in-
> chief, then the witness is not a rebuttal witness or
> anything analogous to one. Rather, rebuttal expert
> testimony is limited to new unforeseen facts brought out
> in the other side's case.

Leaks v. Target Corp., No. CV 414-106, 2015 WL 4092450, at *3 (S.D. Ga. July 6, 2015) (internal citations and quotation marks omitted) (quoting Downs v. River City Grp., LLC, No. 3:11-cv-00885-LRH-WGC, 2014 WL 814303, at *2-3 (D. Nev. Feb. 28, 2014)).  A sign that a report rebuts an opposing report is whether it addresses the "factual underpinnings" of the opposing report.  Id. at *4.

On the other hand, an expert report which is not "truly rebuttal" and untimely violates Rule 26(a) unless the failure to timely disclose was "substantially justified" or is "harmless." See id. (quoting Downs, 2014 WL 814303 at *3).  A report is not truly a rebuttal if it solely expands the party's case-in-chief, introduces new legal theories, or presents the same opinions previously provided.  ITT Corp. v. Xylem Grp., LLC, No. 1:11-cv-3669-WSD, 2012 WL 12871632, at *3-4 (N.D. Ga. Oct. 15, 2012).  The fact that a rebuttal report contains information "proper for the case-in-chief does not preclude the testimony if it is proper both in the case-in-chief and in rebuttal."  Id. at *4 (citing Donnell v. Fid. Nat'l Title Agency, No. 2:07-cv-00001-KJD-PAL, 2012 WL 170990, at *5 (D. Nev. Jan. 20, 2012) (quoting United States v. Lunschen, 614 F.2d 1164, 1170 (8th Cir. 1980))).  Ultimately, "[c]ourts are empowered to exercise their discretion and judgment in determining if a rebuttal expert report addresses the same subject matter as the opposing party's initial expert report." Id. at *3.

**D. Discussion**

The Court begins with Plaintiffs' heavy reliance on <u>Jones Creek Inv'rs, LLC v. Columbia Cnty.</u> No. CV 111-174, 2014 WL 12618171 (S.D. Ga. Oct. 29, 2014). Significant factual discrepancies differentiate the two cases. United States Magistrate Judge Brian K. Epps succinctly summarized the significant issues with the revised expert testimony in <u>Jones Creek</u>:

> The revised adverse value impact analysis attempts to remake the damages case of [the plaintiff] by introducing a cadre of new expert witnesses, new opinions, new methodologies, new projections, and material revisions to old projections. The <u>Daubert</u> Orders do not authorize this sea change in [the plaintiff's] damages case, and it is post-discovery gamesmanship prohibited by Federal Rule of Civil Procedure 26(e) rather than a good faith attempt to correct inadvertent errors or disclose new facts.

2014 WL 12618171, at *1. In <u>Jones Creek</u>, the Court previously entered substantive <u>Daubert</u> rulings, which the plaintiff attempted to circumvent. <u>Id.</u> No attempt to reverse <u>Daubert</u> rulings occurred here. The requisite "gamesmanship" discussed in <u>Jones Creek</u> is missing. 2014 WL 12618171, at *4. Furthermore, <u>Jones Creek</u> did not address rebuttal opinion. Finally, Defendant did not seek to offer new expert witnesses, opinions, methodologies, or material revisions.

Material issues, specifically regarding rainfall totals and other data plugged into the experts' respective modeling, evolved

36

from expert report to expert report.  When significant changes to an opposing expert's underlying data occur, an expert is not stuck to his initial rebuttal that may no longer rebut the expert's revised opinion.  See Leaks, 2015 WL 4092450, at *4 (confronting underlying facts constitutes a rebuttal).  Otherwise, experts would be able to submit a less detailed report initially, wait for the opposing expert to respond to the report, subsequently provide a more complete analysis, and then seek to preclude any further rebuttal.  For a court seeking to do justice between adverse parties, the most accurate opinion an expert can supply and rebuttal to the most accurate opinion, is the desire.

1. Mr. Robertson's August 14, 2019 Engineering Report

Addressing Plaintiffs' objection to Mr. Robertson's August 14, 2019 Engineering Report, the Court finds the contested rebuttal report timely.[14]

a. Rebuttal Report

Mr. Robertson's August 14, 2019 Engineering Report is properly classified as a rebuttal report.  Dr. Wellington's July 15, 2019 Technical Memorandum significantly altered the way Dr. Wellington analyzed the rainfall in question.  In many ways, Dr. Wellington's July 15, 2019 Technical Memorandum is properly classified as a supplementation to his initial reports under Rule

---

[14] Plaintiffs do not argue that Defendant failed to timely disclose Mr. Robertson as an expert.

26(e), rather than a rebuttal, because he acknowledges the use of inaccurate rain totals in his prior report.   It is unlikely Rule 26 binds an opposing expert to a single rebuttal of a report founded on inaccurate data with no chance to respond to a corrected report.

In his August 14, 2019 Engineering Memorandum, Mr. Robertson directly responded to Dr. Wellington's revised report.   He attacked Dr. Wellington's SCS Method modeling for analyzing a twenty-four-hour rain total rather than Rational Method modeling of a significant, three-hour rainfall.   (Robertson Aug. 14, 2019 Engineering Report, at 4, 7; Wellington July 15, 2019 Technical Mem., at 2.)   Mr. Robertson further disputed the rainfall total for one hour that Dr. Wellington surmised for the first time in his July 15, 2019 Technical Memorandum and challenged Dr. Wellington's total rainfall amount.   (Robertson Aug. 14, 2019 Engineering Report, at 5, 7; Wellington July 15, 2019 Technical Mem., at 2.)   Consequently, Mr. Robertson's August 14, 2019 Engineering Report serves to dispute the underlying assumptions of Dr. Wellington's July 15, 2019 Technical Memorandum.   Cf. Fuller v. SunTrust Banks, Inc., No. 1:11-CV-784-ODE, 2019 WL 5448206, at *22 (N.D. Ga. Oct. 3, 2019) (finding rebuttal report within the scope of opposing expert's report).   Overall, Mr. Robertson's August 14, 2019 Engineering Report rebuts Dr. Wellington's report on rainfall totals, methodology, and duration; subject matters of

contention in this case.  Cf. Gaddy v. Terex Corp., No. 1:14-cv-1928-WSD, 2017 WL 3276684, at *3-4 (N.D. Ga. Aug. 2, 2017). Finally, Mr. Robertson, pursuant to Rule 26(e)(1)(A), corrected an error regarding the time of the disputed rainfall due to receipt of corrupt data converted from a different time zone.  (See Robertson Aug. 14, 2019 Engineering Report, at 4, 5, 7.)

b. *Timeliness*

Although the burden is on the party responsible for an untimely disclosure under Rule 26 to establish the delayed disclosure was substantially justified or is harmless, the burden initially falls with Plaintiff, as the movant, to show an untimely disclosure.  See Payne v. C.R. Bard, Inc., No. 6:11-cv-1582-Orl-37GJK, 2014 WL 12622457, at *3 (M.D. Fla. Apr. 21, 2014). Plaintiffs fail to do that here.  To the extent Mr. Robertson improperly bolsters his opinions in the August 14, 2019 Engineering Report, Plaintiffs offer no differentiation between rebuttal and bolstering in the report.  Instead, Plaintiffs assert in conclusory fashion that Mr. Robertson provides the supplemental reports merely to fill in gaps contained in his original report.  It is not the Court's responsibility to parse the numerous reports in an attempt to distinguish proper rebuttal from bolstering; that responsibility rests with the movant.

Under Rule 26(a)(2)(D), Defendant timely submitted Mr. Robertson's August 14, 2019 Engineering Report as a rebuttal

report.   "[W]here a court's scheduling order is silent as to identification of rebuttal experts, Rule 26(a)(2)(D)(ii) will govern the disclosures."[15] <u>McGarity v. FM Carriers, Inc.</u>, No. CV 410-130, 2012 WL 1028593, at *9 (S.D. Ga. Mar. 26, 2012). Defendant submitted Mr. Robertson's Report on August 14, 2019, within thirty days of Dr. Wellington's July 15, 2019 Technical Memorandum.   Accordingly, pursuant to Rule 26(a)(2)(D)(ii), Mr. Robertson's August 14, 2019 Engineering Report is timely.[16]

### 2. <u>Mr. Robertson's November 13, 2019 Engineering Report</u>

The Court next addresses Mr. Robertson's third report, his November 13, 2019 Engineering Report.   Following the same pattern of analysis, the Court first determines whether Mr. Robertson's November 13, 2019 Engineering Report is, in fact, a rebuttal report.

### a. *Rebuttal Report*

Similar to Mr. Robertson's August 14, 2019 Engineering Report, the November 13, 2019 Engineering Report is a rebuttal

---

[15] Here, the Parties stipulated to allowing Plaintiffs' expert a rebuttal report. (Pls.' Mot. to Exclude Robertson Suppl. Reports, at 7.)   The Scheduling Orders, however, contained no deadline for submission of rebuttal expert reports.   (See Scheduling Order, Revised Scheduling Orders.)   If they had, the proponent of the expert report violating the time restrictions of the operative Scheduling Order would likely be required to show "good cause" under Federal Rule of Civil Procedure 16(b).   See McGarity v. FM Carriers, Inc., No. CV 410-130, 2012 WL 1028593, at *9 (S.D. Ga. Mar. 26, 2012).   Because Defendant violated no specific provision of the Scheduling Orders in this case, no such Rule 16(b) showing is required.

[16] Finding that Defendant timely disclosed Mr. Robertson's August 14, 2019 Engineering Report as an expert rebuttal report, the Court need not determine whether any untimely disclosure as to that report was "substantially justified" or "harmless."

report.    In   conjunction   with   Dr.   Wellington's   deposition,
Plaintiffs  produced  Dr.  Wellington's  August  16,  2019  Watershed
Model   Schematic.    Dr.  Wellington  performed  additional  modeling
prior  to  his  deposition,  after  his  third  report,  which:  (1)
manipulated   the   SCS   Method   modeling   to   account   for   a   shorter
duration  rainfall;  (2)  incorporated  new  soil  types  for  Plaintiffs'
properties  and  the  surrounding  areas;  and  (3)  employed  a  CN  of
seventy-five  to  account  for  water  runoff.

      Mr.   Robertson's   November   13,   2019   Engineering   Report
responded  to  Dr.  Wellington's  additional  assumptions  underlying
his  modeling  and  the  modeling  itself.   Mr.  Robertson  asserted  that
Dr.  Wellington  used  an  incorrect  CN  in  his  modeling  based  upon
inaccurate  suppositions  regarding  soil  types.   (Robertson  Nov.  13,
2019  Engineering  Report,  at  4.)   Mr.  Robertson  also  performed  his
own  modeling  using  Dr.  Wellington's  SCS  Method  modeling  with  Mr.
Robertson's   perceived   correct   CN   number.    (Id.  at  5.)    Mr.
Robertson  ran  one  model  using  Dr.  Wellington's  rainfall  total  and
another  with  Mr.  Robertson's  own  surmised  rainfall  total.   (Id.)
The  Court  recognizes  Plaintiffs'  argument  that  Mr.  Robertson  could
have  performed  this  modeling  at  an  earlier  point.   That  said,  Mr.
Robertson  employed  SCS  Method  modeling  to  account  for  short
duration,  intense  rainfall,  only  after  Dr.  Wellington  performed
such  an  analysis  for  the  first  time.   At  its  core,  Mr.  Robertson's
November  13,  2019  Engineering  Report  addressed  new  assumptions,

41

data, and methodology that Dr. Wellington first performed to compose his Watershed Model Schematic he disclosed in his deposition. For these reasons, Mr. Robertson's November 13, 2019 Engineering Report addressed the same subject matter and intended to repel Dr. Wellington's new analysis.

>    b. *Timeliness*

Next, the Court must determine whether Defendant timely disclosed Mr. Robertson's November 13, 2019 Engineering Report. Defendant deposed Dr. Wellington on August 16, 2019, and received the Watershed Model Schematic at the deposition. (Wellington Dep., at 215:21-216:4.) Mr. Robertson submitted his rebuttal dated November 13, 2019. As such, Defendant disclosed Mr. Robertson's final report outside of the thirty-day time period enumerated in Rule 26(a)(2)(D)(ii). Nevertheless, Defendant asserts a timely disclosure. (Def.'s Resp. to Pls.' Mot. to Exclude Robertson Suppl. Reports, Doc. 62, at 15-16.) Defendant incorrectly interprets Rule 26.

Citing Monopoly Hotel Grp., LLC v. Hyatt Hotels Corp., 291 F.R.D. 684, 687 (N.D. Ga. 2013), Defendant implicitly argues it timely disclosed Mr. Robertson's November 13, 2019 Engineering Report more than ninety days before trial. (Id. at 15.)

>    The Advisory Committee Notes make clear that the thirty-day period referred to in Rule 26(a)(2)(D)(ii) expands, rather than narrows, the deadline. See Advisory Committee Notes to the 1993 Amendments ("the disclosures are to be made by all parties at least [ninety] days

> before the trial date or the date by which the case is
> to be ready for trial, except that an additional [thirty]
> days is allowed (unless the court specifies another
> time) for disclosure of expert testimony to be used
> solely to contradict or rebut the testimony that may be
> presented by another party's expert") . . . .

*Monopoly Hotel*, 291 F.R.D. at 687 (emphasis omitted). *Monopoly Hotel*'s quoted section of the advisory committee's language, however, omits a key introductory clause relevant to the case at hand: "*In the absence of such a direction . . . .*" FED. R. CIV. P. 26 advisory committee's notes to 1993 amendment (emphasis added). The "such a direction" refers to the preceding sentence of the advisory committee's notes contemplating that courts should normally prescribe a time for expert disclosures in the scheduling order. Id. Here, the initial Scheduling Order set a deadline for expert disclosures, and therefore, the reasoning of *Monopoly Hotel* is inapplicable.[17]  Because Mr. Robertson's November 13, 2019 Engineering Report falls outside the time for expert disclosures in the Scheduling Order, and Defendants failed to disclose the rebuttal report within thirty days of Dr. Wellington's deposition and Watershed Model Schematic, the disclosure was untimely under Rule 26. Therefore, Defendant is obligated to show the failure to

---

[17] Defendant discusses the Court's extension of the discovery deadline as justification for the timing of the disclosure of Mr. Robertson's November 13, 2019 Engineering Report. (Def.'s Resp. to Pls.' Mot. to Exclude Robertson Suppl. Reports, at 15.) The Revised Scheduling Orders, however, omit any reference to an extension of the disclosure of expert reports. (See Revised Scheduling Orders.) The Revised Scheduling Orders, on the other hand, affirmatively state, "All provisions of the prior Scheduling Orders . . . not revised herein shall remain in full force and effect." (Id.) Therefore, no Court Order extended the expert report disclosure deadline.

timely disclose the report was substantially justified or is harmless.

### c. *Substantial Justification and Harmlessness*

Pursuant to Federal Rule of Civil Procedure 37(c)(1), "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . or at a trial, unless the failure was substantially justified or is harmless." In deciding whether a party's failure to timely disclose an expert's report is harmless, courts consider: (1) the importance of the report; (2) the reasons for the party's failure to disclose the report earlier; and (3) the prejudice to the opposing party if the court fails to exclude the report. See Pleasant v. Neesmith Timber Co., Inc., No. 4:08-cv-192, 2011 WL 841072, at *1 (S.D. Ga. Mar. 7, 2011) (citing Cooley v. Great S. Wood Preserving, 138 F. App'x 149, 161 (11th Cir. 2005)); see also Hewitt v. Liberty Mut. Grp., Inc., 268 F.R.D. 681, 683 (M.D. Fla. 2010) (underlying the harmlessness determination is whether the opposing party suffered prejudice from the untimely disclosure). And substantial justification exists "if reasonable people could differ as to the appropriateness of the contested action." In re Delta/AirTran Baggage Fee Antitrust Litig., 846 F. Supp. 2d 1335, 1358 (N.D. Ga. 2012) (quoting Devaney v. Cont'l Am. Ins. Co., 989 F.2d 1154, 1163 (11th Cir. 1993)). As mentioned, the party

44

responsible for the untimely disclosure bears "[t]he burden of establishing that" the tardy disclosure "was substantially justified or harmless." Mitchell v. Ford Motor Co., 318 F. App'x 821, 824 (11th Cir. 2009) (citation omitted). At the same time, "[t]he district court has broad discretion in determining whether a violation is justified or harmless" under Rule 37. Abdulla v. Klosinski, 898 F. Supp. 2d 1348, 1359 (S.D. Ga. 2012) (citation omitted).

The Court finds, at a minimum, Defendant's tardy disclosure of Mr. Robertson's November 13, 2019 Engineering Report is harmless. First, the importance of the report cannot be discounted. Dr. Wellington produced new modeling and underlying data at his deposition depicting the use of the SCS Method modeling to analyze the impact of the intense, short duration rainfall on the Culvert; an issue going to the heart of this dispute involving competing expert opinions. Although delayed, Defendant's rebuttal to that new modeling possesses the potential to profoundly impact this litigation. As often stated, courts in the Eleventh Circuit "have a strong preference for deciding cases on the merits." Perez v. Wells Fargo N.A., 774 F.3d 1329, 1332 (11th Cir. 2014); accord Collins v. United States, No. 3:08-cv-923-J-32JRK, 2010 WL 4643279, at *5 (M.D. Fla. Nov. 9, 2010). Accordingly, courts are hesitant to turn a blind eye to the Eleventh Circuit's overarching goal for resolving litigation. Pitts v. HP Pelzer Auto. Sys.,

45

Inc., 331 F.R.D. 688, 697 (S.D. Ga. 2019).  The first factor, therefore, favors a finding of harmlessness.

As for the second factor, to justify its delay, Defendant cites the extended discovery deadlines and the stream of revised reports — specifically, Dr. Wellington's disclosure of additional modeling at his deposition.  As to Defendant's first point, the Court finds little merit.  At the outset, the operative Revised Scheduling Order established November 5, 2019, as the close of discovery.   (Second Revised Scheduling Order.)   Despite Defendant's assertion that the Parties' "tacitly" agreed to further extend the discovery deadline beyond November 5, 2019, the general discovery deadline did not control the disclosure of expert reports.  Moreover, Defendant offers no justification for the delay of nearly three months from Dr. Wellington's deposition, until the eve of Mr. Robertson's deposition, to disclose the final report. Cf. Career Emp't Prof'ls, Inc. v. Mfrs. All. Ins. Co., No. CV 417-083, 2019 WL 2661520, at *3 (S.D. Ga. June 27, 2019) (finding itself "at a loss to comprehend" a ten-month delay in supplementing report after the disclosure of substantially more information than presented here).

Likewise, the Court finds Defendant's argument that a volley of expert reports justifies the delay unpersuasive.   Mr. Robertson's right to rebut Dr. Wellington's final report is already established.  This right to rebut, however, is not an explanation

for the three-month delay.   Defendant attempts to justify the disclosure on the eve of Mr. Robertson's deposition claiming Plaintiffs did not provide Defendant the same courtesy.   (Def.'s Resp. to Pls.' Mot. to Exclude Robertson Suppl. Reports, at 8.) Of course, Dr. Wellington supplied additional modeling at his deposition in response to Mr. Robertson's August 14, 2019 Engineering Report provided to Plaintiffs the day before Dr. Wellington's deposition.[18]   The second factor cuts against a finding of substantial justification and harmlessness.

Finally, the issue of prejudice proves to be the deciding factor.   Although the Court is concerned with Mr. Robertson's delayed disclosure of his November 13, 2019 Engineering Report on the eve of his deposition, prejudice to Plaintiffs is lacking. Defendant provided Mr. Robertson's November 13, 2019 Engineering Report prior to Mr. Robertson's deposition.[19]   See Career Emp't Prof'ls, 2019 WL 2661520, at *3; Little v. Ford Motor Co., No. 1:16-CV-00931-ELR, 2017 WL 6994586, at *5 (N.D. Ga. Dec. 21, 2017). In opposition, Plaintiffs conclusorily state "such a supplementation would constitute an unfair and prejudicial surprise to Plaintiffs."   (Pls.' Mot. to Exclude Robertson Suppl.

---

[18] The better course of action, or at least the safer course of action, likely would involve the Parties (1) establishing rebuttal report deadlines for the purpose of scheduling orders and (2) moving the Court for additional time to file rebuttal reports; rather than what transpired.
[19] The Court is not concluding that untimely expert report disclosures on the eve of the expert's deposition will always result in harmlessness.

Reports, at 3.)   Plaintiffs offer no elaboration on the specific prejudice suffered.   Moreover, Plaintiffs failed to request an opportunity to submit an additional expert report, an opportunity to further depose Mr. Robertson at a later date due to Defendant's untimely disclosure of his final report, or any other remedy to cure the alleged prejudice.

Finally, to the extent Defendant's delayed disclosure actually inflicted prejudice upon Plaintiffs, such prejudice is, at least in part, Plaintiffs' own making.   See Long, 762 F. App'x at 871 (finding no abuse of discretion in district court's refusal to exclude expert witness).   Dr. Wellington's multiple amendments to rainfall totals, other underlying data, and the timeframe of rainfall for his modeling, contributed to the barrage of expert reports in this case.   For these reasons, the weight of the considerations generates a finding that Defendant's untimely disclosure of Mr. Robertson's November 13, 2019 Engineering Report is harmless even if not substantially justified and is, therefore, not subject to sanctions.[20]   See Little, 2017 WL 6994586, at *5 (quoting Two Men & a Truck Int'l, Inc. v. Residential & Commercial Transp. Co., No. 4:08cv67-WS/WCS, 2008 WL 5235115, at *2 (N.D. Fla. Oct. 20, 2008)) ("[E]ven if substantial justification is

---

[20] Consequently, the Court need not address the applicable sanctions under Rule 37(c)(1).

lacking, no sanction should be imposed if no harm has occurred to [the] [d]efendant.").

### IV. Plaintiffs' Motion to Exclude Expert Testimony of John Kerns, Rule 30(b)(6) Witness for Defendant

Next, Plaintiffs move to exclude testimony from John Kerns. (Pls.' Mot. to Exclude Kerns Test., Doc. 56.) Plaintiffs' motion relies on two primary arguments: (1) Mr. Kerns improperly offers expert testimony, and (2) Defendant failed to disclose Mr. Kerns as an expert witness or otherwise as a person likely to have discoverable information. (Id. at 4-6.)

### A. Improper Expert Testimony

The Court first addresses Plaintiffs' motion to exclude John Kerns's alleged improper opinion and expert testimony.

#### 1. Background

It is undisputed that Defendant's expert disclosures lacked any identification of John Kerns. (Pls.' Mot. to Exclude Kerns Test. Ex. A, Doc. 56, at 9-36.) Mr. Kerns is a Director of Structures for Defendant responsible for the maintenance, repair, construction, and overall management of manpower for bridges, culverts, tunnels, and retaining walls in North Carolina, South Carolina, and northern Georgia. (Kerns 30(b)(6) Dep., at 8:12-16.) Plaintiffs' motion objects to three specific portions of John Kerns's testimony:

(1) That if an obstructed culvert dams the flow of water, the blockage generates pressure preventing the culvert's clearance of the obstruction on its own (Pls.' Mot. to Exclude Kerns Test., at 3 (citing Kerns 30(b)(6) Dep., at 86:13-89:4, 93:4-7));

(2) That a similar rain event should cause similar flooding (id. (citing Kerns 30(b)(6) Dep., at 89:5-9)); and

(3) That kudzu is a weak vine that does not stop the flow of water (id. (citing Kerns 30(b)(6) Dep., at 87:12-24)).

In response, Defendant asserts the highlighted testimony qualifies as lay witness opinion.   (Def.'s Resp. to Pls.' Mot. to Exclude Kerns Test., Doc. 61, at 6-11.)

### 2. Legal Standard

The Federal Rules of Evidence distinguish expert testimony from lay witness opinion testimony.  As noted, upon qualification, an expert may "testify in the form of an opinion."  FED. R. EVID. 702, *supra*, Section II(A).  On the other hand, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  FED. R. EVID. 701.  "Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experience."  United States v. Hill,

643 F.3d 807, 841 (11th Cir. 2011).  As the advisory committee's notes contemplate, opinion testimony is properly admitted under Rule 701 when the witness obtained the particularized knowledge "by virtue of his or her position in the business."  FED. R. EVID. 701, advisory committee's notes to 2000 amendment.

Analyzing the 2000 amendment to Rule 701, the Eleventh Circuit concluded:

> [M]ost courts have permitted owners and officers to testify without the necessity of qualifying the witness as an expert.  Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.  The amendment does not purport to change this analysis.

Hill, 643 F.3d at 841 (quoting Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd., 320 F.3d 1213, 1222 (11th Cir. 2003) (quoting FED. R. EVID. 701 advisory committee's notes to 2000 amendment)).

3. Discussion

As to the contested portions of Mr. Kerns's testimony, the Court finds that the conclusions are (1) based on Mr. Kerns's perception as Defendant's Director of Structures; (2) helpful to determining a fact in issue; and (3) not based on the type of knowledge falling within Rule 702.  When asked to provide the basis for his knowledge, Mr. Kerns responded, "My testimony is giving you my expertise and experience in culvert blockages and that when

a culvert becomes obstructed and floods, they generally do not clean themselves out if it's significant enough because pressure keeps the obstruction there." (Kerns 30(b)(6) Dep., at 88:25-89:4.) In his role as a Director of Structures for Defendant, Mr. Kerns reviews inspections of employees and visits culverts in the field. (Id. at 8:21-25.) Because Mr. Kerns is responsible for Defendant's culverts, it is understandable that he bases his perceptions on his experiences particular to his job. Mr. Kerns performed no tests for this specific incident, never claimed to be providing expert testimony, and the opinions refrain from exceeding the scope of information obtained based upon his experience with railroads.[21] Consequently, the challenged testimony falls outside Rule 702's scope.

The Court's conclusion aligns with other decisions in this Circuit. In Tampa Bay Shipbuilding & Repair, at the district court, the defendant filed a motion in limine to prevent lay opinion testimony of the plaintiff's officers and employees. 320 F.3d at 1215-16. As the district court concluded with respect to

---

[21] The Court additionally notes that Mr. Kerns provided testimony elicited by Plaintiffs. (See June 12, 2019 Notice of 30(b)(6) Dep., Doc. 61-2, at 2-4; Sept. 26, 2019 Notice of 30(b)(6) Dep., Doc. 61-4, at 2-4.) This is not a situation where the plaintiff lacked the ability to depose the representative, and then the corporate defendant later called the representative as a witness. See Hooks v. GEICO Gen. Ins. Co., No. 3:13-cv-891-J-34 JBT, 2016 WL 5415134, at *8 (M.D. Fla. Sept. 28, 2016) (finding that even if Rule 26 obligated the corporate defendant to disclose the corporate representative, the plaintiff had ample opportunity to notice a 30(b)(6) deposition). After multiple objections to the scope of topics Plaintiffs designated for their noticed Rule 30(b)(6) depositions, Defendant offered Mr. Kerns to respond to those topics. (Objs. & Resps. to Notice of 30(b)(6) Dep., Doc. 61-3.)

one employee's testimony, "From what I can glean from his testimony, this is his business.  This is what he does for [the plaintiff].  He makes estimates, sets prices.  That's what he does.  And obviously, he's accountable for that."  Id. at 1218.  The Eleventh Circuit affirmed the district court's admission of the testimony pursuant to Rule 701 based upon the witness's "particularized knowledge garnered from years of experience within the field."  Id. at 1223; see also Strategic Decisions, LLC v. Martin Luther King Jr. Ctr. for Nonviolent Social Change, Inc., No. 1:13-cv-2510-WSD, 2015 WL 4727143, at *9 (N.D. Ga. Aug. 10, 2015) (permitting the plaintiff's counsel's testimony as to the value of his firm's legal services under Rule 701 based upon "the witness's personal knowledge and experience"); Plumbers and Pipefitters Union No. 421 Health & Welfare Fund v. Brian Thermatore Plumbing & Heating, Inc., No. 5:11-CV-221(HL), 2013 WL 2333208, at *5 (M.D. Ga. May 28, 2013) (permitting declarations of the business owner regarding how the entity conducts business and a plumber regarding plumbing and pipefitting under Rule 701 based upon specialized knowledge); Pickering v. Lorillard Tobacco Co., No: 2:10-CV-633-WKW, 2012 WL 314691, at *15 (M.D. Ala. Jan. 30, 2012) ("[The defendant]'s four division managers based their testimony on their particularized knowledge gained from their years of experience working for [the defendant] in its managerial sales operations.").

The above cases are distinguished from Pediatric Nephrology Assocs. of S. Fla. v. Variety Children's Hosp. No. 1:16-cv-24138, 2017 WL 5665346-UU (S.D. Fla. Nov. 6, 2017). In Pediatric Nephology Assocs. of S. Fla., the plaintiff's chief financial officer ("CFO") employed "research, data, and other extrinsic evidence" to create a valuation model to calculate damages. Id. at *4-5. Several issues drew the CFO's testimony under Rule 702: (1) The plaintiff's CFO lacked prior experience creating a valuation model; (2) the company did not possess the research in its files; and (3) the plaintiff's CFO did not know the information contained in the research based upon his experience with the plaintiff. Id. at *5; see also Jones Creek Inv'rs, LLC v. Columbia Cnty., 98 F. Supp. 3d 1279, 1288-89 (S.D. Ga. 2015) (finding testimony not based on witness's "day-to-day activities"). Based on these reasons, the Eleventh Circuit's analysis in Tampa Bay Shipbuilding & Repair resulted in the exclusion of the plaintiff's CFO's expert testimony in Pediatric Nephrology Assocs. 2017 WL 5665346, at *6.

Of the cases above, the present facts are far closer to those finding testimony permissible under Rule 701. Mr. Kerns based his testimony on experience as a railroader with Defendant. The record contains no indication Mr. Kerns performed outside research or modeling or relied upon extrinsic evidence or data to reach his

conclusions.  Therefore, this case follows Tampa Bay Shipbuilders & Repair.

In their reply, Plaintiffs apparently contend that Mr. Kerns's testimony should be excluded as contradictory.  (Pls.' Reply Supp. Mot. to Exclude Kerns Test., Doc. 76, at 3-4.)  First, because Mr. Kerns is not an expert, the same reliability concerns addressed in Daubert are not in play.  Second, without making a factual conclusion on the issue, there is at least an argument that the cited testimony generates no contradiction:

> A: But vegetation isn't known to stop water, especially kudzu.  Kudzu is a very weak vine.  It doesn't stop water.[22]
>
> .  .  .
>
> Q: Can kudzu stop water?  Can it stop materials that get carried through water like rocks or —
>
> .  .  .
>
> A: Anything can get caught in kudzu.  Anything.

(Kerns 30(b)(6) Dep., at 87:12-15, 19-21, 23-24.)  Abstaining from venturing into a factual determination, it is conceivable that Mr.

---

[22] Notably, Plaintiffs offer no objection to similar opinions other employees of Defendant expressed.  In his Declaration, David Holzbach, employee of Defendant for ten years as a Bridge Foreman and Bridge Mechanic, stated that despite the presence of kudzu "on the rail embankment and around the Culvert, the kudzu posed no issue or concern with respect to the flow of water through the Culvert."  (Holzbach Decl., ¶¶ 5, 6.)  Although the statements are slightly different because Holzbach is speaking specifically regarding the Culvert and Mr. Kerns testifies to the impact of kudzu on culverts generally, Mr. Holzbach's declaration contains no statement that he formed his opinion from witnessing water flowing through the kudzu at the time of making his determination.  In other words, Mr. Kerns and Mr. Holzbach essentially offer the same opinion regarding water's ability to flow through kudzu, but Plaintiffs only object to Mr. Kerns's opinion.

Kerns's statements are not contradictory; kudzu does not stop water, but kudzu can stop substances other than water. Whether a contradiction exists and any subsequent credibility determination is within the province of the jury, not the Court. As a result, Mr. Kerns's statements do not necessitate exclusion.

Further, in their reply brief, Plaintiffs argue Mr. Kerns is precluded from offering any lay testimony because he lacks personal knowledge.

> [Their] argument is unpersuasive. An organization's Rule 30(b)(6) witness may "testify about information known or reasonably available to the organization." FED. R. CIV. P. 30(b)(6). And even if [Plaintiffs'] characterization of the testimony were correct, as the Sixth Circuit recently explained, "evidence considered at the summary judgment stage need not be 'in a form that would be admissible at trial,' as long as the evidence could ultimately be presented in an admissible form." See Lossia v. Flagstar Bancorp, Inc., 895 F.3d 423, 430-31 (6th Cir. 2018) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 . . . (1986)).

Bruno v. Greene Cnty. Sch., 801 F. App'x 681, 684 n.2 (11th Cir. 2020); cf. Pickering, 2012 WL 314691, at *15 (finding supervisors and managers possessed firsthand knowledge of duties of the person's below them). Plaintiffs point to no testimony specifically outside of what is known or reasonably available to Defendant.[23]

---

[23] The rulings related to Mr. Kerns's testimony apply only to summary judgment. As to the statements Plaintiffs identify, Mr. Kerns's testimony appears to apply to culvert blockages generally and not specifically to the blockage of the Culvert. Should Mr. Kerns later provide testimony that Plaintiffs believe crosses the line into improper expert testimony, Plaintiffs may make an appropriate objection at that time.

## B. Failure to Disclose Mr. Kerns Pursuant to Rule 26

Having found that Rule 701 permits Mr. Kerns's challenged testimony, the next question is whether Rule 26 obligated Defendant to identify Mr. Kerns.   Plaintiffs move to exclude Mr. Kerns's expert or opinion testimony pursuant to Rule 37(c)(1) for Defendant's failure to identify him pursuant to Rule 26(a). Although Plaintiffs contend Rule 26 requires such a disclosure, Plaintiffs' motion lacks authority supporting their position.

As discussed earlier in the context of disclosing expert reports, Rule 26(a) sets out litigating parties' duties to disclose.   "[A] party must . . . provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information — along with the subjects of that information — that the disclosing party may use to support its claims or defenses . . . ."   FED. R. CIV. P. 26(a)(1).[24]   A violation of the foregoing rule triggers Rule 37(c)(1).

It is undisputed that Defendant refrained from identifying Mr. Kerns until Plaintiffs noticed their Rule 30(b)(6) deposition of Defendant.   The Eleventh Circuit is yet to decide whether Rule 26(a) requires corporate defendants to identify potential 30(b)(6) designees.   <u>Barron v. EverBank</u>, No. 1:16-CV-04595-AT-CCB, 2019 WL

---

[24] Because Plaintiffs reveal no improper expert testimony under Rule 702, Rule 26(a)(1), rather than Rule 26(a)(2), determines Defendant's disclosure obligation, to the extent one exists, as to Mr. Kerns.

1495305, at *3 (N.D. Ga. Feb. 7, 2019); Hayes v. Deluxe Mfg. Operations LLC, No. 1:16-cv-02056-RWS-RGV, 2018 WL 1461690, at *3 (N.D. Ga. Jan. 9, 2018). Therefore, whether a party is required to disclose a corporate representative in its initial disclosures is not entirely clear. See Hooks, 2016 WL 5415134, at *8 (collecting authority on "both sides of this issue"). The plain language of Rule 26(a)(1)(A)(i) requires disclosure of any individual likely to have discoverable information that may be used to support claims or defenses. Defendant argues that the rule requires disclosure of an "individual," and for the purposes of the 30(b)(6) deposition, Mr. Kerns testified on behalf of Defendant, not himself. (Def.'s Resp. to Pls.' Mot. to Exclude Kerns Test., at 1.) Although Defendant eventually designated Mr. Kerns as one of its Rule 30(b)(6) representatives, Defendant may not have known the identity of its 30(b)(6) representatives until some point after the initial disclosures. Accepting either party's position results in somewhat of an absurdity. Taking Plaintiffs' position, if a corporate defendant is obligated under Rule 26(a)(1) to disclose any employee with discoverable information regarding the issues of the case, the corporate defendant may be required to disclose a countless number of officers, executives, and employees. On the other hand, if all candidates for a 30(b)(6) deposition need not be identified, several employees with intimate knowledge of the facts may be shielded from disclosure. In the

end, the Court refrains from deciding this issue because the delayed disclosure was substantially justified and is harmless, preventing sanctions under Rule 37(c)(1).[25]   See Barron, 2019 WL 1495305, at *3 (refraining from deciding the issue because the failure to identify was substantially justified and harmless); Hayes, 2018 WL 1461690, at *3 (same).

Here, the asserted nondisclosure was substantially justified. First, as noted, substantial justification is found when persons could reasonably differ as to the appropriateness of the nondisclosure.   See In re Delta, supra.   Hooks showed that reasonable courts differ on the issue of disclosure of corporate representatives under Rule 26(a)(1).   "'[T]he substantial justification test is satisfied if there is a genuine dispute concerning compliance,' although 'the proponent's position must have a reasonable basis in law and fact.'"   Barron, 2019 WL 1495305, at *3 (quoting Insect Sci. Res. LLC v. Timberline Fisheries Corp., No. 1:07-CV-2662-JEC-AJB, 2008 WL 11333460, at *12 (N.D. Ga. Nov. 30, 2008)).   As such, Defendant's nondisclosure of Mr. Kerns's identity was substantially justified.

---

[25] Again, the Court highlights that Plaintiffs object inconsistently. See supra note 22. Based on the topics provided, Defendant designated two representatives, Mr. Kerns and Ms. Serigney.  (See Serigney 30(b)(6) Dep., Doc. 55.) Defendant's disclosures also failed to disclose the identity of Ms. Serigney.  (Pls.' Mot. to Exclude Kerns Test. Ex. A, at 9-36.)  Plaintiffs, however, are not moving to exclude Ms. Serigney's testimony pursuant to Rule 37(c)(1).

Second, the Court finds it reasonable that a party would wait until receiving the noticed depositions enumerating the issues the opposing party intends to cover before selecting its 30(b)(6) representative. The case at hand provides a perfect example. Based on the issues Plaintiffs intended to cover in their 30(b)(6) deposition, Defendant needed to designate two representatives because no single representative was appropriate to testify on all issues. A number of reasons potentially impact a corporation's decision regarding its 30(b)(6) representative. QBE Ins. Corp. v. Jorda Enters., Inc., 277 F.R.D. 676, 688 (S.D. Fla 2012). A corporate party would be under a significant and premature burden if forced to produce the name of every potential person it may call in response to a future noticed 30(b)(6) deposition addressing undisclosed topics.

Furthermore, in Hooks, the court ultimately found the omission of a potential 30(b)(6) representative harmless. 2016 WL 5415134, at *8.

> While Rule 26 may technically require [the defendant] to disclose a corporate representative in its Rule 26 disclosures, because [the defendant] is a party to this case, it is difficult to accept that [the plaintiff] was surprised that a corporate representative had relevant testimony regarding [the defendant's] policies and practices . . . .

Id. "In addition, [the defendant]'s failure to disclose itself as a witness did not deprive [the plaintiff] of the opportunity to seek a Rule 30(b)(6) deposition of a [defendant] corporate

representative . . . ." Id.  Accepting that it was not obvious to Plaintiffs that Defendant would designate Mr. Kerns as a 30(b)(6) deponent, Plaintiffs understood that Defendant could be deposed and, in fact, noticed and carried out Rule 30(b)(6) depositions of Defendant.  Additionally, the advisory committee's notes to Rule 37(c)(1) state that "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties" is "harmless."  FED. R. CIV. P. 37(c)(1), advisory committee's notes to 1993 amendment.  Because Plaintiffs noticed a 30(b)(6) deposition, any surprise that Defendant possessed discoverable information through its employees is slight.

Lastly, after Plaintiffs noticed the 30(b)(6) deposition, Defendant provided the identities of its designees.[26]  (Oct. 11, 2019 Email Disclosing Def.'s 30(b)(6) Representatives, Doc. 61-8.)  Plaintiffs conducted Mr. Kerns's 30(b)(6) deposition on October 16, 2019.  (Kerns 30(b)(6) Dep., at 1.)  Pursuant to the August 23, 2019 Revised Scheduling Order, discovery closed on November 5, 2019, but the remainder of the 30(b)(6) deposition took place on November 14, 2019.  (Serigney 30(b)(6) Dep., Doc. 55, at 1.)  Therefore, in the event Plaintiffs suffered prejudice from the nondisclosure, time existed to request an additional

---

[26] To the extent Plaintiffs assert Defendant improperly omitted Mr. Kerns's identity from its interrogatory responses, Defendant provided the identity of Mr. Kerns prior to the close of discovery. (See Oct. 11, 2019 Email Disclosing Def.'s 30(b)(6) Representatives, Doc. 61-8.)

deposition allowing additional preparation.   The record lacks evidence that Plaintiffs made any attempt to cure their implied prejudice.   For these reasons, failure to disclose Mr. Kerns pursuant to Rule 26(a)(1)(A)(i), to the extent such an obligation existed, was substantially justified and is harmless rendering exclusion of his testimony improper.


### V. PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S CONCLUSIONS OF LAW AND EXHIBIT ELEVEN TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs' motion seeks to strike (1) improper legal conclusions contained within Defendant's statement of undisputed material facts as violating Local Rule 56.1 and (2) the November 28, 2017 Federal Railroad Administration ("FRA") Opinion Letter that Defendant attached as an exhibit to its motion for summary judgment (Nov. 28, 2017 FRA Opinion Letter, Doc. 43-11).   (Pls.' Mot. to Strike Conclusions of Law, Doc. 72.)

### A. Defendant's Statement of Undisputed Material Facts and Conclusions of Law

Plaintiffs direct the Court's attention to a number of paragraphs contained within Defendant's Statement of Undisputed Material Facts and Conclusions of Law.   (Pls.' Mot. to Strike Conclusions of Law, at 2-4.)   Plaintiffs correctly contend that Defendant's SOUMF contains legal analysis and conclusions.   None of the considered statements, however, necessitate exclusion.

The relevant Local Rule provides:

> Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, in addition to the brief, there shall be annexed to the motion a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof.

LR 56.1, SDGa.  Plaintiffs cite <u>Allen v. Freeman</u>, No. CV 110-022, 2013 WL 3356040 (S.D. Ga. July 3, 2013), to establish Defendant's SOUMF violated Local Rule 56.1.  (Pls.' Mot. to Strike Conclusions of Law, at 1-2, 5.)  The Court agrees with Defendant that the present facts are distinguishable from those presented in <u>Allen</u>. (See Def.'s Resp. to Pls.' Mot. to Strike Conclusions of Law, Doc. 82, at 3.)  In <u>Allen</u>, the plaintiff used the response to the defendant's statement of undisputed material facts to offer additional legal argument in response to the defendant's motion for summary judgment.  2013 WL 3356040, at *14.  Comparing paragraphs Plaintiffs highlighted in Defendant's SOUMF with Defendant's motion for summary judgment, the Court finds no additional legal argument in Defendant's SOUMF that Defendant omitted from its motion for summary judgment.[27]  Hence, it cannot be said Defendant manipulated its SOUMF as an "end-run around the page limitations applicable to summary judgment briefing."  <u>Id.</u> Additionally, because Defendant's SOUMF reflects the arguments

---

[27] In the interest of brevity, the Court refrains from citing every comparison from Plaintiffs' motion to strike to Defendant's corresponding motion for summary judgment but does cite examples of the overlap.  (<u>Compare</u> Pls.' Mot. to Strike Conclusions of Law, at 2-4 (quoting Def.'s SOUMF, Doc. 44, ¶¶ 2, 5, 7, 13, 22, 31), <u>with</u> Def.'s Mot. for Summ. J., Doc. 43, at 11, 12, 13, 18, 24-25.)

made in the motion for summary judgment, Plaintiffs received opportunity to respond in their response briefing.  Defendant's recitation of certain portions of its motion for summary judgment in its SOUMF does not rise to a violation of Local Rule 56.1.

**B. November 28, 2017 FRA Opinion Letter**

Plaintiffs move to strike Exhibit Eleven to Defendant's motion for summary judgment.  The exhibit is a letter from John T. Seguin, Assistant Chief Counsel for Safety of the FRA to a private attorney.  (Nov. 28, 2017 FRA Opinion Letter, at 2, 4.)  The letter responds to questions posed to the FRA regarding interpretations of 49 C.F.R. § 213.33.  (Id. at 2.)  The letter contains two responses potentially at issue in this case, both providing interpretations of language in 49 C.F.R. § 213.33, the meanings of: (1) "expected water flow" and (2) "area concerned."  (Id. at 2, 3.)

According to Plaintiffs' argument on the subject, the Nov. 28, 2017 FRA Opinion Letter is inadmissible because the letter communicates a legal standard.  (Pls.' Mot. to Strike Conclusions of Law, at 5.)  Plaintiffs push Gordon v. New England Cent. R.R., Inc. in support.  No. 2:17-cv-00154, 2019 WL 5084160 (D. Vt. Oct. 10, 2019).  From the information provided, the Vermont District Court apparently addressed the admissibility of the same November 28, 2017 FRA Opinion Letter.  Id. at *3.  The Vermont District Court concluded the document impermissibly communicated a legal

standard. Id. In so doing, the Vermont District Court disregarded the proponent of the evidence's argument that it offered the exhibit "to provide guidance as to the meaning and/or interpretation of regulatory language." Id. Defendant, here, asserts that it offers the exhibit for the same purpose, "as authoritative guidance by the [FRA] as to the proper scope and interpretation of 49 C.F.R. § 213.33." (Def.'s Resp. to Pls.' Mot. to Strike Conclusions of Law, at 4.)

Gordon is not binding on this Court. Importantly, in reaching its conclusion, Gordon cited to Hygh v. Jacobs, 961 F.2d 359, 364 (2d Cir. 1992). The full quotation from Hygh, not included in Gordon in its entirety, reads: "[T]he testimony would remain objectionable by communicating a legal standard — explicit or implicit — to the jury." Id. (emphasis added). To the extent Plaintiffs seek to prevent consideration of the November 28, 2017 FRA Opinion Letter as factual evidence, the Court takes no issue with that argument because it is well-established that the legal standard is an issue of law.[28] See Cottrell v. Caldwell, 85 F.3d 1480, 1485 (11th Cir. 1996). Plaintiffs, however, filed a motion to strike to prevent the Court's consideration of the November 28, 2017 FRA Opinion Letter in determining the appropriate legal standard under 49 C.F.R. § 213.33. Consequently, any rationale

---

[28] Defendant also concedes that it is not tendering the November 28, 2017 FRA Opinion Letter as evidence. (Def.'s Resp. to Pls.' Mot. to Strike Conclusions of Law, at 4.)

suggesting it is improper to admit evidence communicating a legal standard to a jury is entirely inapplicable to the Court's determination of the appropriate legal standard for Plaintiffs' negligence per se claim under the disputed regulation.

Ultimately, however, the Court need not reach a decision on this issue. Defendant asserts that the November 28, 2017 FRA Opinion Letter is offered to assist in forming a legal standard with respect to 49 C.F.R. § 213.33. For the reasons set forth in Section VI(B)(3)(b), *infra*, the Court need not consider the November 28, 2017 FRA Opinion Letter. Thus, Plaintiffs' motion to exclude Exhibit Eleven to Defendant's motion for summary judgment is moot.[29]

## VI. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Having decided the foregoing, the Court lastly turns to Defendant's motion for summary judgment. (Def.'s Mot. for Summ. J., Doc. 43.)

## A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the

---

[29] Should the November 28, 2017 FRA Opinion Letter become an issue at a later date, Plaintiffs may move to exclude it at that time.

governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine "if the nonmoving party has produced evidence such that a reasonable fact finder could return a verdict in its favor," Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor," United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (citations omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp., 477 U.S. at 323. Because the standard for summary judgment mirrors that for a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id. When the movant does not bear the burden of proof at trial, it may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Celotex Corp., 477 U.S. 317). The movant

cannot satisfy its initial burden by merely declaring that the non-moving party cannot meet its burden at trial.

If — and only if — the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. at 608. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. For example, if the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993). On the other hand, if the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1033–34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of Court provided Plaintiffs notice of the motion for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 58.)  For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), are satisfied. Plaintiffs responded to the motion for summary judgment (Doc. 73), Defendant replied (Doc. 86), and Plaintiffs sur-replied (Doc. 91). The time for filing materials has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration. In reaching its conclusions herein, the Court has evaluated the Parties' briefs, other submissions, and the evidentiary record in this case.

## B. Discussion

Plaintiffs raise six claims in the operative complaint, Plaintiffs' first amended complaint: (1) nuisance (First Am. Compl., Doc. 20, ¶¶ 57-70; (2) negligence (id. ¶¶ 72-77); (3) negligence per se based on alleged violations of two federal regulations: 49 C.F.R. §§ 213.33 and 219.37 (id. ¶¶ 79-86); (4) attorneys' fees, costs, and expenses (id. ¶ 88); (5) injunctive relief (id. ¶¶ 90-99); and (6) punitive damages (id. ¶¶ 100-02). Defendant moves for summary judgment as to each asserted claim. (Def.'s Mot. for Summ. J., at 1-2, 25.)

1. Nuisance

Defendant is entitled to summary judgment on Plaintiffs' Count I for nuisance. The primary issue is whether a single flooding incident may permit a nuisance claim.

> A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man.

O.C.G.A. § 41-1-1.[30] Georgia law addresses both public and private nuisances: a public nuisance impacts all persons "within the sphere of its operation" whereas "[a] private nuisance is one limited in its injurious effects to one or a few individuals." Id. § 41-1-2. Because the flood injured two property owners, the alleged nuisance here is a private nuisance. O.C.G.A. § 41-1-4.

Given the different ways a nuisance may arise, Georgia courts have determined, "nuisance is incapable of any exact or comprehensive definition." Fielder v. Rice Constr. Co., 522 S.E.2d 13, 16 (Ga. Ct. App. 1999). The amorphous nature of nuisance gives rise to complexities pinning down when an interference reaches the level of a nuisance. Georgia law advances a general definition stating, "To recover under a nuisance claim, 'the plaintiff must show the existence of the nuisance complained of, that he or she

---

[30] The Parties do not dispute that Georgia law governs Plaintiffs' state law claims. (See Def.'s Mot. for Summ. J., at 10-11; Pls.' Resp. to Def.'s Mot. for Summ. J., Doc. 73, at 4-9.)

has suffered injury, and that the injury complained of was caused by the alleged nuisance.'" Bord v. Hillman, 780 S.E.2d 725, 728 (Ga. Ct. App. 2015) (quoting Rice v. Six Flags Over Ga., LLC, 572 S.E.2d 322, 327 (Ga. Ct. App. 2002)). According to Defendant, a nuisance requires more than a one-time incident, and must be continuous in nature or overly extensive in duration. (Def.'s Mot. for Summ. J, at 10-11.) "[A] private nuisance is one where the invasion is intentional merely in the sense that the defendant has created or continued the interference with full knowledge that the harm to the plaintiff's interests are occurring or are substantially certain to follow." Fielder, 522 S.E.2d at 16 (quoting Prosser & Keaton on the Law of Torts, § 87, at 524-25 (5th ed.)). Under this interpretation, a nuisance may exist based on an isolated incident if the tortfeasor is "substantially certain" that an interference will follow. Georgia law also holds, however, "The whole idea of nuisance is that of either a continuous or regularly repetitious act or condition which causes the hurt, inconvenience or injury. A single isolated occurrence or act, which if regularly repeated would constitute a nuisance, is not a nuisance until it is regularly repeated." Ridley v. Turner, 778 S.E.2d 844, 847 (Ga Ct. App. 2015) (physical precedent only as to Division Three) (quoting Ingram v. Baldwin Cnty., 254 S.E.2d 429, 430 (Ga. Ct. App. 1979)); see also Hibbs v. City of Riverdale, 478 S.E.2d 121, 122 (Ga. 1996) ("[W]here a municipality negligently

71

constructs or undertakes to maintain a sewer or drainage system which causes the *repeated* flooding of property, a continuing, abatable nuisance is established . . . .") (emphasis in original).

Assuming, without deciding, that a one-time incident may grant a cause of action for nuisance when the tortfeasor is substantially certain the interference will follow, Plaintiffs point to no facts suggesting Defendant had information that the July 26, 2017 flood was substantially likely to occur.   As Plaintiffs note, "the rain event, which regardless of the disagreements as to the amount of rainfall is within the design range of expected storms, is not a one time event." (Pls.' Resp. to Def.'s Mot. for Summ. J., Doc. 73, at 9 (citing Pls.' Resp. to Def.'s SOUMF, ¶ 16.)   Plaintiffs, however, point to no other examples of flooding on their property.   Therefore, even accepting Plaintiffs' position that the storm event was not unusual as true, absent some prior incident of flooding, nothing suggests Defendant maintained substantial certainty a flooding incident was imminent from a regular rainfall that had not caused flooding before.

Having determined Plaintiffs fail under a substantial certainty theory of nuisance, the Court addresses whether Plaintiffs may recover for a continuing nuisance.   Plaintiffs apparently concede some type of repetition or continuation is required but disagree with Defendant as to whether the continuation applies to the cause or the effect.   Defendant argues the

regularity requirement applies to the interference; said another way, repeated flooding of Plaintiffs' property. Plaintiffs contend the recurrence necessity applies to the tortfeasor's alleged conduct — Defendant's repeated failure to maintain the Culvert — whether or not any continuing interference occurs. Upon review of Georgia law, the answer is that the there must be continued conduct that results in a repetitious interference.

In Uniroyal, Inc. v. Hood, the court analyzed a fact pattern similar to this one in which water from a construction site caused a single occasion of flooding on the plaintiff's property. 588 F.2d 454, 463 (5th Cir. 1979) (applying Georgia law).[31] The Fifth Circuit concluded:

> In regard to the nuisance theory, under Georgia law[,] a single, isolated occurrence cannot constitute a nuisance. . . . In this case, the evidence conclusively reveals that water entered the warehouse on only one occasion despite a record of persistent rain over a five-month period. Clearly, therefore, the construction site was not continuously maintained in a condition creating a nuisance causing damage to the plaintiff, and, as a matter of law, [the plaintiff] could not have recovered under a nuisance theory.

Id. at 462-63; cf. West v. CSX Transp., Inc., 498 S.E.2d 67, 70 (1998) (noting the plaintiff's property "was subject to flooding twice a year").

---

[31] "Fifth Circuit cases decided prior to October 1, 1981[,] are binding precedent in th[e] [Eleventh] [C]ircuit." Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1205 n.9 (11th Cir. 2007).

Not only does the case law support a requirement that a continuing nuisance theory requires a repeating interference, but Plaintiffs' theory of the case belies their argument. Interpreting the facts in Plaintiffs' favor, the rainstorm on July 26, 2017, was not an aberration, the Culvert has the capacity to handle the amount of rainwater that fell, and therefore, kudzu and debris necessarily prevented the flow of water through the Culvert. Both before and since, according to Plaintiffs, the same area experienced similar rainfall events without flooding. Therefore, as concluded in Uniroyal, the Culvert "was not continuously maintained in a condition creating a nuisance causing damage to the plaintiff," prohibiting recovery for nuisance as a matter of law. Plaintiffs fail to offer evidence establishing Defendant's continued failure to maintain the Culvert resulting in repetitious, concrete injury. For these reasons, summary judgment is proper as to Plaintiffs' nuisance claim.

## 2. Negligence

Defendant further moves for summary judgment as to Plaintiffs' second claim for negligence. "The essential elements of a negligence claim are the existence of a legal duty; breach of that duty; a causal connection between the defendant's conduct and the plaintiff's injury; and damages." Boller v. Robert W. Woodruff Arts Ctr., Inc., 716 S.E.2d 713, 716 (Ga. Ct. App. 2011) (citations omitted).

a. *Duty*

"[T]he threshold issue in a negligence action is whether and to what extent the defendant owes a legal duty to the plaintiff," which is "a question of law." Id. (citations omitted).  One way a plaintiff may establish a legal duty owed is to point to reported common law decisions of appellate courts recognizing the duty. Id.  Defendant mounts no serious contest to the existence of a legal duty and primarily combats Plaintiffs on whether any evidence shows Defendant breached the duty. (See Def.'s Mot. for Summ. J., at 12-13; Def.'s Reply Supp. Mot. for Summ. J., Doc. 86, at 9-11.) Nevertheless, the Court evaluates whether such a duty exists. According to Plaintiffs, Georgia common law imposes a duty on property owners to refrain from "injur[ing] or invad[ing] the rights of adjacent property owners." (Pls.' Resp. to Def.'s Mot. for Summ. J., Doc. 73, at 9.)  The Court agrees with Plaintiffs that Georgia common law creates such a duty.

"The owner of a drainage ditch is under a duty to maintain it so that the surface waters do not overflow to the damage of adjacent property owners." Equitable Life Assurance Soc'y of the U.S. v. Tinsley Mill Vill., 294 S.E.2d 495, 497 (Ga. 1982). "Similarly, the owner of a creekbed containing a creek flowing through culverts constructed by such owner . . . is under a duty to maintain them so that the waters do not overflow to the damage of adjacent property owners." Id.

75

From those two principles is derived the rule that "where a railroad company constructs a fill or embankment which obstructs the natural drainage and flow of water from adjacent land belonging to another, and in order to prevent the water from backing upon the land the railroad company constructs a ditch or drain to carry off the water, the railroad company owes a duty to the owner of the land not to permit the ditch to fill up and become obstructed so as to turn the water back upon the adjacent land."

West, 498 S.E.2d at 70 (quoting S. Ry. Co. v. Thacker, 179 S.E. 225, 226 (1935) (physical precedent only)). Therefore, a railroad possesses "a duty to maintain its ditches to accommodate the naturally-occurring runoff." Id. at 71. The foregoing comfortably settles that Defendant owed a duty to Plaintiffs, as adjacent property owners, to maintain the Culvert so as to prevent an obstruction of the Culvert from damaging Plaintiffs' property.

b. *Breach and Causation*

Defendant asserts Plaintiffs are unable to establish negligence's breach and causation elements as a matter of law. Defendant relies on three primary arguments in its motion for summary judgment: (1) Mr. Holzbach concluded on May 3, 2017, that the Culvert required no maintenance; (2) the rain event exceeded a forty-five-year recurrence interval; and (3) the exclusion of Dr. Wellington's expert opinion eliminates any fact issue as to breach and causation. (Def.'s Mot. for Summ. J., at 12-13.) Defendant's arguments fail to merit summary judgment.

First, Mr. Holzbach inspected the Culvert on May 3, 2017; late November or early December 2017; March 9, 2018; and October 15, 2019. (Holzbach Decl., ¶¶ 4, 6.)  According to Mr. Holzbach, the Culvert was unobstructed at all times he inspected it.  (Id. ¶¶ 5, 6.)  He further declared that at all times, the kudzu growth in proximity to the Culvert presented and continues to pose "no issue or concern with respect to the flow of water through the Culvert" necessitating no maintenance at any time of inspection. (Id.)   Mr.  Holzbach's  declaration  is  evidence  supporting Defendant's position but is insufficient to absolve Defendant of negligence liability in the face of competing evidence.  Moreover, Mr. Holzbach offers no evidence of the condition of the Culvert on or immediately after the July 26, 2017 flood.  Consequently, Mr. Holzbach's  declaration  is  insufficient  to  show  Plaintiffs  are unable to establish a breach as a matter of law.

Second, Defendant's assertion that it is undisputed the recurrence interval for the one-hour duration of the rainfall is forty-five  years  is,  in  fact,  disputed.   According  to  Dr. Wellington, based on his calculation of the rainfall during the relevant one-hour timeframe, "2.98 inches of accumulated rainfall in  [one]  hour  corresponds  to  a  thirty-one-year  recurrence interval."  (Wellington July 15, 2019 Technical Mem., at 2.)  As a result, it is undisputed that the one-hour rainfall carries a recurrence interval of at least thirty-one years.  A thirty-one-

year interval exceeds criteria Defendant offers recommending anticipation of a twenty-five-year-interval storm for culvert construction in Columbia County. (Robertson Aug. 14, 2019 Engineering Report, at 8.) Even so, evidence on both sides exists claiming different durations of rainfall are appropriate to consider, that different amounts of rain fell, and other factors allowing a jury to conclude that Defendant breached its duty to maintain the Culvert even with a one-hour recurrence interval of thirty-one years. Further of consequence is that Defendant offers no authority establishing that local guidance recommending a recurrence interval for construction of a culvert establishes the legal standard for breach.

More to the point, Defendant offers evidence that the flooding would have occurred regardless of whether kudzu or debris obstructed the Culvert. Plaintiffs put forth evidence that the Culvert construction provided the capacity to handle the storm in question, absent an obstruction. Consequently, Plaintiffs do not appear to assert that Defendant negligently constructed the Culvert. The question is whether Defendant negligently maintained the Culvert. Accordingly, the recurrence interval is a greater issue under the causation prong than the breach prong. To illustrate, even if the storm mirrored the flood described in the Book of Genesis, the question is whether the rainfall would have flooded Plaintiffs' property, and to what extent, even if the

78

Culvert was fully operational and unobstructed. Therefore, it is for the jury to determine whether the severity of the storm or the condition of the Culvert caused the flooding of Plaintiffs' property.[32]

Finally, Defendant argues that upon exclusion of Dr. Wellington's testimony, no issue of fact exists as to causation. For the reasons contained in Section II, *supra*, Dr. Wellington's expert opinion, for the most part, is not excluded.

The Court refrains from rehashing all evidence in Dr. Wellington's opinion as it has been discussed in great detail, but Dr. Wellington's opinions through modeling offer evidence that the Culvert had the capacity to handle the July 26, 2017 storm. Additionally, the record contains evidence revealing kudzu growth in the vicinity of the Culvert, debris surrounding the Culvert, and even a photograph showing debris in the mouth of the Culvert. (Def.'s Mot. for Summ. J. Ex. 2, at 13-15; Wellington Apr. 10, 2018 Technical Mem., at 4.)  Based on the foregoing, issues of fact exist going to both the breach and causation prongs of negligence, and therefore, summary judgment is improper as to Plaintiffs' negligence claim.

3. Negligence Per Se

---

[32] As outlined, the record contains evidence that Plaintiffs suffered damages as a result of the flooding.

A plaintiff may also show a duty imposed by citing to a valid statutory enactment. Boller, 716 S.E.2d at 716. In Georgia, a claim for "negligence per se arises when a statute is violated, the person injured by the violation is within the class of persons the statute was intended to protect, and the harm complained of was the harm the statute was intended to guard against." Goldstein, Garber & Salama, LLC v. J.B., 797 S.E.2d 87, 92 (Ga. 2017) (quoting Murphy v. Bajjani, 647 S.E.2d 54, 58 (Ga. 2007)). A violation of an ordinance or regulation may substitute for a statutory violation in a Georgia negligence per se claim. Combs v. Atlanta Auto Auction, Inc., 650 S.E.2d 709, 715 (Ga. Ct. App. 2007); accord McLain v. Mariner Health Care, Inc., 631 S.E.2d 435, 437 (Ga. Ct. App. 2006) (noting federal regulations "can likewise establish that a defendant breached a duty owed to a plaintiff as a matter of law"). Negligence per se supplies the duty and breach elements of negligence. Cent. Anesthesia Assocs., P.C. v. Worthy, 333 S.E.2d 829, 831 (Ga. 1985). "The plaintiffs must still prove a causal connection (proximate cause) between the breach of th[e] statutory duty and the injuries sustained . . . , as well as their damages." Id.

As found, issues of fact exist as to causation and damages. Accordingly, the issue for the Court to decide here is whether a statute, regulation, or ordinance accounts for the duty and breach elements as a matter of law. Plaintiffs assert two federal

regulations serve as the foundation for their negligence per se claim: 49 C.F.R. § 213.37[33] and 49 C.F.R. ¶ 213.33.   The Court addresses each.

a. *49 C.F.R. § 213.37*

49 C.F.R. § 213.37 provides:

Vegetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so that it does not —

(a) Become a fire hazard to track-carrying structures;

(b) Obstruct visibility of railroad signs and signals:

(1) Along the right-of-way, and

(2) At highway-rail crossings; . . .

(c) Interfere with railroad employees performing normal trackside duties;

(d) Prevent proper functioning of signal and communication lines; or

(e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.

Defendant offers authority interpreting "immediately adjacent to roadbed" to exclude the kudzu growth on the Culvert in this case, which the Parties do not dispute is some fifty feet from the rail line.   The Court need not undertake such an analysis here.

---

[33] Plaintiffs' amended complaint cites to 49 C.F.R. § 219.37, rather than 49 C.F.R. § 213.37.   (Am. Compl., ¶ 82.)   Defendant correctly notes that 49 C.F.R. § 219.37 is nowhere to be found in the federal regulations.   (Def.'s Mot. for Summ. J., at 13.)   Plaintiffs acknowledge the regulation they intended to rely upon for their negligence per se claim is 49 C.F.R. § 213.37.   (Pls.' Resp. to Def.'s Mot. for Summ. J, at 15.)   Because the Court finds Defendant is entitled to summary judgment as to Plaintiffs' negligence per se claim pursuant to 49 C.F.R. § 213.37, the Court need not decide whether Plaintiffs must amend their complaint to properly assert this claim.

49 C.F.R. § 213.37 offers the rare occurrence where the language actually expresses the harm the regulation intends to protect against. Among the goals of 49 C.F.R. § 213.37, nowhere does the regulation mention controlling vegetation to prevent flooding or anything similar. Under the *expressio unius est exclusio alterius* principle, the inclusion of deterrence against certain harm, but not flooding, expels the notion that flooding is the type of harm 49 C.F.R. § 213.37 intends to prevent.

Although addressing the issue of preemption, MD Mall Assocs., LLC v. CSX Trasnp., Inc. provides a comparison to better understand 49 C.F.R. § 213.37's breadth:

> Other courts have likewise concluded that a federal regulation dictating that "vegetation on railroad property which is on or immediately adjacent to the roadbed shall be controlled so that it does not obstruct visibility of railroad signs and signals," 49 C.F.R. § 213.37(b), serves to "preempt any state-law claim regarding vegetation growth that blocks a sign immediately adjacent to a crossing, but it does not impose a broader duty under federal law to control vegetation so that it does not obstruct a motorist's visibility of oncoming trains."

715 F.3d 479, 490 (3d Cir. 2013) (quoting Shanklin v. Norfolk S. Ry. Co., 369 F.3d 978, 987 (6th Cir. 2004) (collecting cases)). The example makes it clear that the federal regulation exists to protect against those harms enumerated in the regulation, not beyond. As a result, Plaintiffs' negligence per se claim pursuant to 49 C.F.R. § 213.37 fails as a matter of law.

b. *49 C.F.R. § 213.33*

"Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." 49 C.F.R. § 213.33. First, the Court analyzes whether Plaintiffs fall within the class of persons 49 C.F.R. § 213.33 intends to protect, and whether flooding of adjacent property is the type of harm 49 C.F.R. § 213.33 is designed to guard against.

As always, the Court begins with the regulation's language. The language offers little help aside from the fact that it is silent as to its applicability to adjacent property owners. See Jeffers v. BNSF Ry. Co., No. 14-CV-188, 2014 WL 1773532, at *5 (W.D. La. May 1, 2014) (citing MD Mall Assocs., 715 F.3d at 491). The overall scheme of the Federal Railroad Safety Act ("FRSA"), however, is telling. "[T]he FRSA, under which [section] 213.33 was promulgated, was enacted 'to *promote safety* in every area of railroad operations and reduce railroad related accidents and incidents.'" Waubay Lake Farmers Ass'n v. BNSF Ry. Co., No. 12-4179-RAL, 2014 WL 4287086, at *8 (D.S.D. Aug. 28, 2014) (emphasis in original). Therefore, "the Secretary of Transportation" possesses authority to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a). The part of the FRSA regulations under which section 213.33 falls is called

the Track Safety Standards.   49 C.F.R. § 213.1.   The Track Safety Standards "prescribe[] minimum safety requirements for railroad track" to permit "safe operations over [the] track."   Id. Accordingly, "Section 213.33 is . . . plainly intended to prevent water from pooling on or around railroad tracks . . . to avoid potentially dangerous conditions occasioned by standing water, such as the presence of debris on tracks, icing conditions, and compromised track integrity."   MD Mall Assocs., 715 F.3d at 492. Based on the foregoing, the rules promulgated under the Track Safety Standards are designed to prevent harms that may arise from accidents or incidents on a railroad track and to protect persons operating equipment, working, or otherwise on or near the track.

Consequently, "Section 213.33 does not cover state law negligence claims by adjacent property owners."   Gallo v. Union Pac. R.R. Co., 372 F. Supp. 3d 470, 483 (W.D. Tex. Feb. 19, 2019). "There is no indication whatsoever that [section 213.33] was intended to address storm water discharge onto a neighboring property."   MD Mall Assocs., 715 F.3d at 492; accord Gallo, 372 F. Supp. 3d at 484 ("Section 213.33 is concerned with railroad safety, not preventing damage to neighboring property.").   The harm Plaintiffs suffered is not connected with the safety of the railroad.   Gallo, 372 F. Supp. 3d at 484 ("The harm sought to be avoided by [section] 213.33 is 'wholly different' than the harm alleged by . . . Plaintiffs.").   Because Plaintiffs fail to

establish that 49 C.F.R. § 213.33 was promulgated to protect against water flow onto adjacent properties, Plaintiffs' negligence per se claim dependent on this regulation fails.

### 4. Punitive Damages

Pursuant to O.C.G.A. § 51-12-5.1(b), "Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."  Negligence or even gross negligence is insufficient to support a punitive damage award. Hutcherson v. Progressive Corp., 984 F.2d 1152, 1155 (11th Cir. 1993) (citing Colonial Pipeline Co. v. Brown, 365 S.E.2d 827, 830 (Ga. 1988)).  "There must be circumstances of aggravation or outrage."  Artzner v. A & A Exterminators, 531 S.E.2d 200, 205 (Ga. Ct. App. 2000) (quoting Tri-Cnty. Inv. Grp. v. S. States, 500, S.E.2d 22, 27 (Ga. Ct. App. 1998)).  Although the question of punitive damages is generally reserved for the jury, Read v. Benedict, 406 S.E.2d 488, 491 (Ga. Ct. App. 1991), summary judgment is proper as to a claim for punitive damages if "based on the record," the plaintiff "cannot show by clear and convincing evidence that [the defendant]'s actions evinced willfulness and wantonness sufficient to raise the presumption of conscious indifference to consequences."  Pillsbury Co. v. W. Carrollton

Parchment Co., 210 F. App'x 915, 921 (2006) (applying Georgia law); accord Keith v. Beard, 464 S.E.2d 633, 638-39 (Ga. Ct. App. 1995) (affirming grant of summary judgment as to claim for punitive damages upon concluding "the record contain[ed] insufficient evidence to justify sending the punitive damage issue to a jury").

Plaintiffs claim, "[Defendant]'s failure to maintain its property in the face of an affirmative duty to keep the flow of water unobstructed can show a conscious indifference to the consequences of its actions or failure to act." (Pls.' Resp. to Def.'s Mot. for Summ. J., at 17.) Plaintiffs merely recount the standard for ordinary negligence. It is certainly possible that such a failure could show conscious indifference, but here, Plaintiffs point to nothing in the record actually showing conscious indifference. Further, the Court is unaware of any facts allowing a jury to find Defendant's conduct rose to a level required to sustain Plaintiffs' punitive damages claim.

As noted in Section VI(B)(1), *supra*, no evidence shows Defendant possessed knowledge regarding past floods or blockages of the Culvert. In fact, the only item in the record speaking to any affirmative conduct prior to July 26, 2017, is that Defendant inspected the Culvert and found no issue. (Holzbach Decl., ¶ 5.) This case contains insufficient facts to present the issue of punitive damages to a jury.

5. Injunctive Relief

Next, Plaintiffs seek a permanent injunction to prevent "Defendant from causing further damage and irreparable harm to Plaintiffs' property by requiring Defendant to adequately maintain its property in accordance with all applicable regulations and duties." (Pls.' Resp. to Def.'s Mot. for Summ. J., at 19.)

> A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010) (citation omitted). "Irreparable injury is 'the sine qua non of injunctive relief.'" Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000). The irreparable injury must be "neither remote nor speculative, but actual and imminent." Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990).

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a[n] [injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Sampson v. Murray, 415 U.S. 61, 90 (1974) (citation omitted). Plaintiffs are unable to traverse the first requirement.

Plaintiffs point to no evidence showing an actual and imminent threat of irreparable harm. Plaintiffs' theory of the case negates any possibility of such a showing. Plaintiffs assert the July 26, 2017 rainfall was not extraordinary. In the three years since that storm, the Court is not aware of Plaintiffs' property flooding despite Plaintiffs' assertion that "Mr. Marshall detailed in his affidavit how he still lives in fear during any normal rain storm that another [Defendant] flood will destroy his house." (Pls.' Resp. to Def.'s Mot. for Summ. J., at 19-20.) No concrete evidence establishes that future flooding is likely.

As Plaintiffs note, their requested injunctive relief is to require Defendant to keep the Culvert entrance clear for water flow. (Id.) Defendant correctly categorizes Plaintiffs' request as one that Defendant exercise its duty of care. "It is well-established in this circuit that an injunction demanding that a party do nothing more specific than 'obey the law' is impermissible." Elend v. Basham, 471 F.3d 1199, 1209 (11th Cir. 2006). The one-time, short term, flooding event on July 26, 2017, is insufficient to demonstrate an irreparable injury necessitating issuance of a permanent injunction.

6. Attorneys' Fees and Litigation Expenses

The Court turns to Plaintiffs' claim for attorneys' fees and litigation expenses.  "The expenses of litigation generally shall not be allowed as a part of the damages; but . . . where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." O.C.G.A. § 13-6-11.  Generally, "[q]uestions of bad faith, stubborn litigiousness, and unnecessary trouble and expense are . . . for the jury." Duncan v. Klein, 720 S.E.2d 341, 347 (Ga. Ct. App. 2011).  Nevertheless, summary judgment is proper when no evidence supports an award of attorneys' fees.  Id.

"[E]very intentional tort invokes a species of bad faith." Tyler v. Lincoln, 527 S.E.2d 180, 183 (Ga. Ct. App. 2000).  "But mere negligence will not support an award of attorney fees based on bad faith." Metro. Atlanta Rapid Transit Auth. v. Mitchell, 659 S.E.2d 605, 608 (Ga. Ct. App. 2007) (quoting Hartsock v. Rich's Emps. Credit Union, 632 S.E.2d 476, 479 (Ga. Ct. App. 2006)).  "'Bad faith' is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive or interest of ill will." Id. (quoting Rapid Grp., Inc. v. Yellow Cab of Columbus, 557 S.E.2d 420, 426 (Ga. Ct. App. 2001)).  Negligence fails to support bad faith because ordinary negligence lacks the "sinister motive, dishonest purpose, moral

89

obliquity, conscious wrongdoing, or any other species of bad faith." Id.

Plaintiffs' only remaining claim, negligence, cannot support an award of attorneys' fees for bad faith. At best, Plaintiffs are able to show Defendant inspected the Culvert prior to the July 26, 2017 flooding, that Defendant knew kudzu obstructed the Culvert, and knew that it had a duty to remove the kudzu. But no evidence establishes that Defendant breached that duty with ill will. The case presents facts similar to those in Mitchell. Mitchell involved a trip and fall the plaintiff suffered boarding the defendant's elevator because the floor of the elevator was three inches above the train station floor. Id. at 606. In Mitchell, the evidence showed that the defendant knew the conditions that would cause the elevator to mislevel based upon prior observations but failed to correct the hazard on the day at issue. Id. at 607-08. Despite a jury finding the defendant liable for negligence, the Georgia Court of Appeals concluded that the finding could not support an award of attorney's fees for bad faith as a matter of law. Id. at 608.

As for stubborn litigiousness or unnecessary trouble or expense, "attorney's fees are not authorized under O.C.G.A. § 13-6-11 if the evidence shows that 'a genuine dispute exists — whether of law or fact, on liability or amount of damages, or on any comparable issue. Where no such dispute is found, the jury would

90

be authorized to award the expenses of litigation.'" Brown v. Baker, 398 S.E.2d 797, 800 (Ga. Ct. App. 1990) (quoting Dimambro Northend Assocs. v. Williams, 312 S.E.2d 386, 392 (1983)). "Where . . . a bona fide controversy clearly exists between the parties, there is no evidence to support an award for litigation expenses." Driggers v. Campbell, 543 S.E.2d 787, 791 (Ga. Ct. App. 2000).

On the stubbornly litigious side, in addition to the foregoing, Plaintiffs argue that Defendant "refused to resolve the instant dispute without court intervention." (Pls.' Resp. to Def.'s Mot. for Summ. J., at 18.) It is well-established in Georgia that "[a] mere refusal to pay a disputed claim is not the equivalent of stubborn litigiousness." Horton v. Dennis, 750 S.E.2d 493, 497 (Ga. Ct. App. 2013) (citation omitted). A refusal to pay plus the absence of a bona fide dispute, however, can support an award of attorneys' fees.

Defendant contends that bona fide issues exist precluding recovery of attorneys' fees and expenses for stubborn litigiousness. The Court agrees with Defendant. In denying Defendant summary judgment on Plaintiffs' negligence claim, the Court found the existence of competing evidence on the issue of maintenance of the Culvert and conflicting expert testimony on the question of rainfall amounts and duration. These conflicts support the Court's determination that a bona fide controversy clearly

exists on the question of negligence and Defendant is entitled to summary judgment on Plaintiffs' O.C.G.A. § 13-6-11 claim. See Ideal Pool Corp. v. Champion, 277 S.E.2d 753, 756 (Ga. Ct. App. 1981).

7. Emotional Damages

Finally, Defendant argues Georgia law precludes Plaintiffs' recovery of emotional or psychological damages for the loss of property. (Def.'s Reply Supp. Mot. for Summ. J., at 23.)   It appears to the Court that the Parties ultimately arrived at the same conclusion. (Compare id. at 22-23, with Pls.' Sur-Reply Opp'n to Def.'s Mot. for Summ. J., Doc. 91, at 4.)   Additionally, to the extent a dispute remains, Plaintiffs assert the emotional damages flow from a nuisance claim as opposed to a negligence claim.   The nuisance claim is no longer active.   For these reasons, the Court finds the issue moot.   To the extent the dispute is unsettled following this Order, the Court will take up the issue in a motion in limine and proposed jury instructions as the Parties deem appropriate.


**VII. CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

(1) Defendant's motion for summary judgment (Doc. 43) is **GRANTED IN PART** and **DENIED IN PART**.   Defendant's motion for summary judgment is **GRANTED** as to Plaintiffs' claims for nuisance; negligence per se; punitive damages; and attorneys' fees, costs,

and expenses pursuant to bad faith and stubborn litigiousness and unnecessary trouble and expense.   Defendant's motion for summary judgment is **DENIED** as to Plaintiffs' claim for negligence and **DENIED AS MOOT** as to Plaintiffs' claim for emotional damages.

(2) Plaintiffs' motion to exclude Mr. Thomas Robertson's supplemental expert reports (Doc. 54) is **DENIED;**

(3) Plaintiffs' motion to exclude testimony of Mr. John Kerns as one of Defendant's Federal Rule of Civil Procedure 30(b)(6) witnesses (Doc. 56) is **DENIED;**

(4) Defendant's motion to exclude expert testimony of Dr. Brian Wellington (Doc. 60) is **GRANTED IN PART** as to any conclusion or opinion of Dr. Wellington that the debris discovered around the Culvert actually clogged the Culvert and **DENIED IN PART** as to the remainder of his testimony; and

(5) Plaintiffs' motion to strike conclusions of law contained in Defendant's statement of undisputed material facts and conclusions of law (Doc. 72) is **DENIED** and to strike Exhibit Eleven to Defendant's motion for summary judgment (Doc. 72) is **DENIED AS MOOT.**

Plaintiffs' surviving claim for negligence shall proceed to trial in due time.

**ORDER ENTERED** at Augusta, Georgia, this ⟋24th day of September, 2020.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA